IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 3, 2007 Session

## RICHARD SCHNEIDER ET AL. v. THE CITY OF JACKSON

**Appeal by Permission from the Court of Appeals, Western Section**
**Chancery Court for Madison County**
**No. 62846   James F. Butler, Chancellor**

**No. W2005-01234-SC-R11-CV - Filed on May 25, 2007**

We granted this appeal primarily to determine whether Tennessee common law includes a law enforcement investigative privilege ("law enforcement privilege") which operates to exempt from disclosure governmental records that would otherwise be accessible via the Tennessee Public Records Act ("Public Records Act").  See Tenn. Code Ann. § 10-7-503 (Supp. 2006).[1]  We hold that Tennessee common law does not include the law enforcement privilege and that it should not be adopted herein.  Accordingly, we reverse the judgment of the Court of Appeals, which adopted the law enforcement privilege and applied it as an exception to the Public Records Act.  However, we remand this case to the trial court to determine whether any of the police department records at issue are part of a pending, open, or ongoing criminal investigation and thus exempt from disclosure.  We also reverse the Court of Appeals' judgment and reinstate the judgment of the trial court permitting Petitioners to recover their attorneys' fees pursuant to Tennessee Code Annotated section 10-7-505(g) (1999).  On remand, the trial court shall calculate and award Petitioners the attorneys' fees they have incurred on appeal.  Finally, we reverse the judgment of the Court of Appeals and reinstate the permanent injunction issued by the trial court requiring the City of Jackson ("City") to respond in writing to future Public Records Act requests of *The Jackson Sun* or its agents.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Reinstated; Case Remanded to the Trial Court for Further Proceedings**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which, JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ.

---

[1]Because the statutory language has not changed, citations in this opinion will refer to the current version of the Public Records Act which appears in 1999 Replacement Volume 3A of the Tennessee Code Annotated or in the 2006 supplement to Volume 3A.

Charles M. Purcell and Matt S. Shepherd, Jackson, Tennessee, for appellants, Richard Schneider, Tajuana Cheshier, Jamie Page, and The Gannett Satellite Information Network, d/b/a *The Jackson Sun*.

Lewis L. Cobb and Sara E. Barnett, Jackson, Tennessee, for appellee, City of Jackson.

Douglas R. Pierce, Nashville, Tennessee, for amicus curiae, Tennessee Association of Broadcasters.

Alfred H. Knight and Alan D. Johnson, Nashville, Tennessee, for amicus curiae, *The Tennessean.*

Richard L. Hollow, Knoxville, Tennessee, for amicus curiae, The Tennessee Press Association.

## OPINION

## I. BACKGROUND

In 2004, reporters with *The Jackson Sun*, a local newspaper in Jackson, Tennessee, asked the City for access to two categories of records: (1) field interview cards generated by police officers of the City; and (2) financial records concerning the operation of the West Tennessee Diamond Jaxx ("Diamond Jaxx"), a class "AA" minor league professional baseball team. The Diamond Jaxx, through its owner, Lozinak Baseball Properties ("Lozinak Baseball"), leased and operated in a stadium the City owned. The requests for access were grounded upon the Public Records Act, which provides, in pertinent part, that "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." Tenn. Code Ann. § 10-7-503(a) (Supp. 2006)

The City received the first request for the field interview cards on July 30, 2004, from reporter Tajuana Cheshier, who sought access to "photos taken since January 2004 of pedestrians and motorists in which officers applied the practice of 'reasonable suspicion' in order to photograph them, although they were not arrested for a crime." The City's police chief verbally confirmed the existence of these records, but the City declined to grant Cheshier access to them.

On October 26, 2004, legal counsel for Cheshier and *The Jackson Sun* wrote a letter to the City's attorney, reiterating Cheshier's request and seeking access to "all photographic or digital images and/or copies of any documents in the possession of the City of Jackson . . . of any and all persons photographed or interviewed by the Jackson Police officers as part of all 'field interviews.'" Counsel explained that *The Jackson Sun* had reason to believe that City police officers had conducted 369 field interviews since January of 2004, photographed the interviewees, and prepared field interview cards containing both the photographs and the officers' handwritten notes about information obtained during the field interviews and that none of the persons interviewed were

-2-

subsequently arrested or charged with a criminal offense. Also in this October 26, 2004 letter, legal counsel asked the City to provide *The Jackson Sun* access to Diamond Jaxx financial records, including any "notices of relocation" and "any related documents" which the City had already received or would later receive from the Diamond Jaxx.

On December 14, 2004, Jamie Page, another reporter with *The Jackson Sun*, sent a letter to the City's Mayor requesting "access to all financial statements between the West Tennessee Diamond Jaxx and the City of Jackson, or any financial documentation relating to the financial agreement between the two parties, including but not limited to, any financial statement(s) demonstrating how the Jaxx have lost at least $150,000 a year over the last two baseball seasons as indicated by [Lozinak Baseball Properties]."

The City failed either to provide access to the requested records or to provide a written response to the repeated requests. Thus, on January 26, 2005, the Gannett Satellite Information Network, d/b/a *The Jackson Sun,* Richard Schneider, executive editor of *The Jackson Sun*, Cheshier, and Page (collectively "Petitioners") filed a petition in the Madison County Chancery Court pursuant to Tennessee Code Annotated section 10-7-505(a) (1999)[2] seeking access to the field interview cards and to the Diamond Jaxx financial records.[3] Petitioners also sought to recover their attorneys' fees, asserting that the City knew the records were public and willfully refused to disclose them. See Tenn. Code Ann. § 10-7-505(g) (1999) (allowing the trial court to assess against the nondisclosing governmental entity "all reasonable costs involved in obtaining the record, including reasonable attorneys' fees" upon a finding that the governmental entity "knew that such record was public and willfully refused to disclose it").

Consistent with the provisions of the Public Records Act, the trial court set an expedited hearing on the matter for February 7, 2005, and ordered the City to appear and to show cause why the petition should not be granted. See Tenn. Code Ann. § 10-7-505(b) (1999). In addition, the Chancellor directed the City immediately to provide him the requested documents for *in camera* inspection. Despite this order, the City failed to provide the records to the Chancellor prior to the hearing. However, a few hours before the hearing, the City filed a written response to the petition, alleging that the field interview cards were "privileged documents" not subject to disclosure under the Public Records Act because they concerned "police tactics on investigations." The City further argued that the financial records were "confidential property" belonging to Lozinak Baseball and,

---

[2]Tennessee Code Annotated section 10-7-505(a) provides:

> Any citizen of Tennessee who shall request the right of personal inspection of any state, county or municipal record as provided in § 10-7-503, and whose request has been in whole or in part denied . . . shall be entitled to petition for access to any such record and to obtain judicial review of the actions taken to deny the access.

[3]Petitioners also sought access to audiotapes of certain 911 emergency telephone calls resulting from a shooting incident. The trial court denied this request, finding that the tapes were part of a pending criminal investigation and not subject to disclosure under the Public Records Act. Petitioners have not appealed this ruling.

as such, not subject to disclosure under the Public Records Act. As support for this proposition the City relied upon a confidentiality clause in its lease agreement with Lozinak Baseball.[4]

At the hearing, the City produced the stadium lease and a notice of termination letter ("Notice") from the President of Lozinak Baseball.[5] In the letter, addressed to the City's Mayor and dated January 28, 2005, Lozinak Baseball advised that it planned to terminate the stadium lease after the 2005 baseball season, explaining that the Diamond Jaxx had incurred a "Significant Operating Loss" during the 2004 fiscal year and had sustained operating losses in excess of $150,000 for two consecutive years, constituting grounds for termination under the lease. Attached to the Notice were the Diamond Jaxx financial records substantiating these asserted grounds for termination. The City agreed to provide Petitioners access to the Notice, conceding that it qualified as a public record; however, the City argued that the attached financial records were not public records and remained exempt from disclosure during a forty-five-day period in which the City retained its contractual option to purchase the Diamond Jaxx. The City asserted that because it had the option to purchase the Diamond Jaxx, these financial records were exempt from disclosure as state agency records concerning the value of property that a governmental entity is considering acquiring. See Tenn. Code Ann. § 10-7-504(a)(6) (Supp. 2006). The City also submitted a February 3, 2005 letter to the Chancellor in which Lozinak Baseball invoked the contractual confidentiality clause and admonished the City not to disclose the Diamond Jaxx financial records attached to the Notice.

As for the field interview cards, the City presented a "representative sampling" at the hearing consisting of seventeen field interview cards that had been generated since January 1, 2005. The City expressed its willingness to produce all of the field interview cards for the Chancellor's *in camera* inspection, but the Chancellor declined, finding the representative sample sufficient to enable him to decide the case.

In addition, the City called four witnesses to testify about the field interview cards, including: Commander Dennis Mays, division commander, licensed attorney, and legal advisor for the City's

---

[4]The confidentiality clause in the lease provides:

N. Books, Records, and Accountings . . . . The City shall have the right to make inspections of the books and records of [Lozinak Baseball] from time to time for purposes of verifying the accuracy of the accounting procedures and revenues to be derived by the City from the Stadium. The City's right of inspection shall be subject to its agreement to (i) refrain from making copies of any of [Lozinak Baseball's] records except as permitted by [Lozinak Baseball], such permission not to be reasonably withheld, delayed or conditioned and (ii) hold all information obtained as a result of such inspection confidential and to not disseminate any such information to any third party without [Lozinak Baseball's] approval *except as otherwise required under the Tennessee Open Records Law.*

(Emphasis added.)

[5]The Notice and accompanying financial records were hand-delivered to the City's Mayor on January 28, 2005, two days after Petitioners filed suit and several months after Petitioners submitted their written requests for access in October and December 2004.

police department; Lieutenant Mike Holt, commander of the violent crimes unit of the City's police department; Lieutenant Patrick Willis, commander of the gang enforcement unit for the City; and Richard Staples, the City's Chief of Police. In summary, these witnesses testified that the City's police officers have been preparing field interview cards since 1993 or 1994 and that the cards memorialize the contact an officer has "while conducting some kind of investigation with a citizen." The cards are intended to be a "central repository for information" the officers acquire while on patrol, and the cards allow "Officer A to use Officer B's work product . . . to work his or her own cases."

The field interview cards are "entered into the computer data base" and stored by "date and time." Each card includes blank lines on which officers may record the date, time, and reason for the investigative stop, the investigating officer's name and number, the interviewee's name, address, telephone number, date of birth, race, sex, height, weight, driver's license number, social security number, eye color, hair color, location of the interview, description of the interviewee's clothing, information about the interviewee's vehicle, if applicable, including year, make, model, license number, license type, license year, license state, and vehicle color. Typically, but not always, field interview cards include photographs of the interviewees. However, as Lieutenant Willis explained, field interview cards do not include other information officers obtain from their conversations with interviewees. Officers generated 369 field interview cards in 2004, and approximately 80 percent of the persons interviewed were African-American.

All of the City's witnesses testified that field interview cards are valuable tools which allow the City's police to investigate and to solve crimes. For example, because suspects often use incorrect names, and multiple gang members often use the same street name, field interview cards, complete with photographs and other biographical information, are extremely valuable to the police for identification purposes. In addition, the City's police officers investigate crimes and identify potential suspects and witnesses by reviewing field interview cards from the area where the crimes occurred. Commander Mayes and Lieutenant Holt recalled a specific incident of a serial rapist being apprehended as a result of a lead gained from field interview cards, and these witnesses also opined that many other crimes have been solved as a result of leads obtained from field interview cards.

All of the City's witnesses expressed concern that affording public access to the field interview cards will compromise confidential police techniques and strategies, enable criminals to avoid detection, reveal the identities of and thereby endanger witnesses and informants, increase gang retaliation against citizens who speak with the police, and chill the public's willingness to cooperate with the police. Notwithstanding these concerns, Chief Staples admitted on cross-examination that field interview cards "very rarely" have been returned to interviewees, only "two or three times" that he could recall.

None of these witnesses actually reviewed the field interview cards prior to the hearing; however, all of them believed and opined that the field interview cards were exempt from disclosure by the law enforcement privilege. Concerning the perceived breadth of the law enforcement privilege, Commander Mays, a licensed attorney who consulted with the City's chief of police about

Petitioners' July and October 2004 requests for access to the field interview cards, stated:

> [A]s far as I'm concerned, [the field interview cards] are privileged, period. Even the fact . . . that an officer stopped and talked to a particular individual at a particular place is privileged . . . . The information in these field interview cards is not public record, as far as I'm concerned, because of the fact it identifies and exposes the tactics and techniques that we use and the people that we talk to in order to conduct criminal investigations.

Subsequently, Commander Mays clarified:

> My position is the law enforcement privilege trumps that statute [the Public Records Act] because of the fact the statute doesn't take into consideration the privileges that the Courts have long recognized that say[], "You don't have to release anything related to how you do your job; the results, yes, but not how you do it."

The Chancellor rejected the City's arguments that Tennessee law recognizes the law enforcement privilege as an exception to the Public Records Act and held that the law enforcement privilege does not exempt the field interview cards from disclosure. Additionally, the Chancellor rejected the City's arguments that the contractual confidentiality clause and the statutory exception to the Public Records Act preclude disclosure of the Diamond Jaxx financial records. The Chancellor issued a permanent injunction requiring the City to respond in writing to all future written public records requests from *The Jackson Sun* or its agents and to explain in its written response whether the record sought would be produced and, if not, the basis for nondisclosure. The Chancellor awarded Petitioners' attorneys' fees in the total amount of $6,170, allocating one half of this amount to each category of records requested.

The City appealed, asserting that the law enforcement privilege precluded disclosure of the field interview cards. As for the Diamond Jaxx financial records, the City contested only the Chancellor's award of attorneys' fees. Although the Court of Appeals agreed with the trial court that no statute or rule shielded the field interview cards from disclosure under the Public Records Act, the Court of Appeals canvassed decisions of other jurisdictions, adopted the law enforcement privilege, and held that it precludes disclosure of records within its scope. The Court of Appeals then remanded the case to the trial court to determine whether the field interview cards are protected by the law enforcement privilege. In light of these holdings, the Court of Appeals reversed the trial court's judgment awarding attorneys' fees to Petitioners based on the City's failure to disclose the field interview cards. The Court of Appeals also vacated the award of attorneys' fees stemming from the City's failure to disclose the Diamond Jaxx financial records, remanded to the trial court, and instructed the trial court to determine which of these financial records the City had in its possession when Petitioners submitted their requests. Finally, the Court of Appeals vacated the permanent injunction requiring the City to respond in writing to future public records requests, finding that the Public Records Act did not authorize such an injunction.

Petitioners filed an application for permission to appeal, challenging the Court of Appeals' ruling on each of these issues. We granted permission to appeal primarily to consider Petitioners' argument that the Court of Appeals erred in adopting the law enforcement privilege and in holding that it operates as an exception to the Public Records Act; however, we will hereinafter address each of the issues raised.

## II. PUBLIC RECORDS ACT

Tennessee courts have long recognized the public's right to examine governmental records. See, e.g., State ex rel. Wellford v. Williams, 75 S.W. 948 (Tenn. 1903). In 1957, the General Assembly codified this public access doctrine by enacting the Public Records Act. Ballard v. Herzke, 924 S.W.2d 652, 661 (Tenn. 1996). The Public Records Act now "governs the right of access to records of government agencies in this state." Cole v. Campbell, 968 S.W.2d 274, 275 (Tenn. 1998). Facilitating access to governmental records promotes public awareness and knowledge of governmental actions and encourages governmental officials and agencies to remain accountable to the citizens of Tennessee. Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc., 87 S.W.3d 67, 74-75 (Tenn. 2002).

The Public Records Act broadly defines "[p]ublic record or records" or "state record or records" to include "all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency." Tenn. Code Ann. §10-7-301(6) (Supp. 2006).[6] Given this definition, the Public Records Act has been described as an "'all encompassing legislative attempt to cover all printed matter created or received by government in its official capacity.'" Griffin v. City of Knoxville, 821 S.W.2d 921, 923 (Tenn. 1991) (quoting Bd. of Educ. of Memphis City Schools v. Memphis Publ'g Co., 585 S.W.2d 629, 630 (Tenn. Ct. App. 1979)). Furthermore, the Public Records Act mandates that "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." Tenn. Code Ann. § 10-7-503(a) (Supp. 2006). These statutes create a presumption of openness and express a clear legislative mandate favoring disclosure of governmental records. See State v. Cawood, 134 S.W.3d 159, 165 (Tenn. 2004); Tennessean v. Elec. Power Bd., 979 S.W.2d 297, 305 (Tenn. 1998); Arnold v. City of Chattanooga, 19 S.W.3d 779, 785 (Tenn. Ct. App. 1999).

---

[6]As this Court has noted, another definition of "records" appears in Part 1 of the Act, however, "the definition provided by this provision was not intended to apply to other parts of the Act, and indeed, it is possible that the inclusion of that statute as part of the Act may be 'a compiler's error, occurring in the renumbering of the 1980 edition of the Code.'" Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc., 87 S.W.3d at 75 n.6 (quoting Creative Rests., Inc. v. City of Memphis, 795 S.W.2d 672, 675 (Tenn. Ct. App. 1990)).

Moreover, Tennessee citizens denied access to governmental records have the right to file a petition in court and "to obtain judicial review of the actions taken to deny the access." Tenn. Code Ann. § 10-7-505(a) (1999). At the hearing on such a petition, the governmental entity bears the burden of proof and must justify nondisclosure of the record by a preponderance of the evidence. Id. § 10-7-505(c). Finally, the General Assembly has directed the courts to construe broadly the Public Records Act "so as to give the fullest possible access to public records." Id. § 10-7-505(d). Thus, unless an exception is established, we must require disclosure "even in the face of serious countervailing considerations." Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d 681, 684 (Tenn. 1994).

Petitioners argue that the Public Records Act entitles them to have access to the field interview cards and maintain that the Court of Appeals essentially adopted and applied a public policy exception to the Public Records Act. The City responds that the law enforcement privilege has long been recognized in the United States and for this reason, the Court of Appeals was correct to adopt it as Tennessee law even though the law enforcement privilege had not previously been adopted in Tennessee. Moreover, the City contends, because it is "state law," the law enforcement privilege operates as an exception to the Public Records Act.

We begin our analysis by considering how the language of the Public Records Act has developed and evolved. As originally enacted in 1957, the Public Records Act specifically excepted from disclosure only two categories of records;[7] however, it created a general exception from disclosure for public records whose confidentiality was "provided by law or regulations made pursuant thereto."[8] Although the specific statutory exceptions increased over time, in 1984 the General Assembly amended the statute to narrow the general exception to only those records made confidential by "state statute."[9]

Two years later, this Court was called upon to apply the 1984 amendment. In Memphis Publ'g Co. v. Holt, 710 S.W.2d 513 (Tenn. 1986), a newspaper requested access to closed investigative files of the Memphis police department. Id. at 515. This Court held that the Public Records Act required disclosure because "no statute exempt[ed] the file in controversy." Id. at 518. The Court rejected the police department's assertion that Tennessee Rule of Criminal Procedure 16(a)(2)[10] precluded disclosure of the records, noting that Rule 16(a)(2) only limited access to

_____

[7]The categories excepted were medical records of patients in state hospitals and military records involving the security of the United States or the State of Tennessee. Act of Mar. 18, 1957, ch. 285 § 2, 1957 Tenn. Pub. Acts 932, 932 (codified as amended at Tenn. Code Ann. § 10-7-504(a)(1), (3)).

[8]Act of Mar. 18, 1957, ch. 285, § 1, 1957 Tenn. Pub. Acts. 932, 932.

[9]Act of May 17, 1984, ch. 929, § 1, 1984 Pub. Acts 890, 890.

[10]The language of current Rule 16(a)(2) is substantially the same as the language of the Rule at issue in Holt. Currently, Rule 16(a)(2) provides:

records relevant to a pending or contemplated criminal action and did not "come into play" to limit access to the closed investigative file, which was "not relevant to any pending or contemplated criminal action." Id. at 517.

One year later this Court was called upon to reconcile the limitation provided by Rule 16(a)(2) with the disclosure required by the Public Records Act. In Appman v. Worthington, 746 S.W.2d 165 (Tenn. 1987), lawyers representing prisoners charged with killing a fellow prisoner invoked the Public Records Act to obtain records of the Department of Correction's internal investigation into the murder. Id. at 165-66. Acknowledging that no statute specifically exempted these records from disclosure, the Appman Court nonetheless held that Rule 16(a)(2) exempted from disclosure under the Public Records Act all "open" criminal investigative files that "are relevant to pending or contemplated criminal action." Id. at 166. In so holding, the Appman Court stressed that the Rules of Criminal Procedure "became effective . . . upon the [G]overnor's approval of a joint resolution of the [L]egislature adopting the rules, " a procedure nearly identical to the procedure by which statutes are enacted, and emphasized that the Rules "have the force of law" throughout the state Id. at 166. The Court expressly reaffirmed Holt, however, explaining that the Rule 16(a)(2) "exception to disclosure and inspection does not apply to investigative files in possession of state agents or law enforcement officers, where the files have been closed and are not relevant to any pending or contemplated criminal action." Id.

Four years later, in 1991, the General Assembly amended the Public Records Act by replacing the phrase "state statute" with the phrase "state law."[11] This Court has since held that the phrase "state law," added by the 1991 amendment, encompasses the Rules of Civil Procedure such that documents shielded by the Rules need not be disclosed pursuant to the Public Records Act. See Ballard, 924 S.W.2d at 662 (holding that the Public Records Act does not mandate disclosure of documents sealed by a protective order entered pursuant to the Tennessee Rules of Civil Procedure); see also Swift v. Campbell, 159 S.W.3d 565, 576 (Tenn. Ct. App. 2004), perm. appeal denied (Tenn. 2005) (holding that the Public Records Act does not mandate disclosure of records protected by Tennessee Rule of Criminal Procedure 16); Arnold, 19 S.W.3d at 786 (holding that the Public Records Act does not mandate disclosure of documents protected by the work product doctrine, codified as Tennessee Rule of Civil Procedure 26.02).

Relying upon Ballard, the City argues that the Court of Appeals correctly held that the phrase "state law" encompasses common law privileges, such as the law enforcement privilege, as exceptions to the Public Records Act. As the parties to this appeal and the amici curiae recognize,

_____

Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.

[11]Act of May 6, 1991, ch. 369, § 7, 1991 Tenn. Pub. Acts 598, 598 (codified as amended at Tenn. Code Ann. § 10-7-503(a)).

this Court has not previously been called upon to determine whether the General Assembly intended by use of the phrase "state law" to include common law privileges as exceptions to the Public Records Act. Additionally, although the Court of Appeals had previously opined that the phrase "state law" includes common law privileges, the Court of Appeals had not previously applied a common law privilege as an exception to the Public Records Act. See Swift, 159 S.W.3d at 571-72 (stating that the 1991 Amendment "broadened the permissible sources of exceptions from disclosure to include not only statutes, but also the Constitution of Tennessee, the common law, the rules of court, and administrative rules and regulations because each of these has the force and effect of law in Tennessee") (footnote omitted); Eldridge v. Putnam County, 86 S.W.3d 572, 575 (Tenn. Ct. App. 2001) (refusing to recognize the "'informer privilege'" but allowing the County on remand to argue that exceptions provided by the "Rules of Civil Procedure" or other exceptions "found in the common law" justified nondisclosure under the Public Records Act);[12] Arnold, 19 S.W.3d at 785 (stating that the court would look to "the Rules of Civil Procedure and the Common Law" for exceptions to the Public Records Act). Although this is an interesting issue, we need not in this appeal precisely define the scope of the phrase "state law." Even assuming the phrase encompasses common law privileges, the law enforcement privilege has never been adopted in Tennessee and thus is not a "state law" exception to the Public Records Act.

In adopting the law enforcement privilege, the Court of Appeals relied exclusively upon federal court decisions and decisions of other state courts. However, the Court of Appeals failed to account for the distinctions between the Public Records Act and the open records laws of these other jurisdictions.[13] For example, the federal government's open records law, the Freedom of Information Act ("FOIA"), has nine broad and general exceptions to disclosure that necessarily require substantial judicial interpretation. See 5 U.S.C.A. § 552(b) (West 2007). The Illinois and Massachusetts courts decisions upon which the Court of Appeals relied were interpreting state statutes patterned upon FOIA. See Roulette v. Dep't of Cent. Mgmt. Servs., 490 N.E.2d 60, 64 (Ill.

---

[12]The City is correct that "Tennessee common law recognizes the government's privilege, subject to certain limitations, *to withhold from the accused* the identity of a confidential informant." House v. State, 44 S.W.3d 508, 512 (Tenn. 2001) (emphasis added). "[A] *defendant* has no constitutional right to require disclosure of the informant's identity, and the decision is left to the discretion of the trial court." Id. (emphasis added). House was rendered in the context of a criminal case. This Court has not previously considered whether the common law "informant privilege" operates as an exception to disclosure under the Public Records Act. We need not consider this issue in this appeal because the City did not raise this issue in the courts below. Therefore the issue has been waived. See, e.g., Dye v. Witco Corp., 216 S.W.3d 317, 322 (Tenn. 2007) ("We hold that Dye's argument concerning the date he discovered the permanency and compensability of his injury is waived because it was not raised before the trial court."); Civil Serv. Merit Bd. of City of Knoxville v. Burson, 816 S.W.2d 725, 735 (Tenn. 1991) ("There is no indication in the record that the issue was ever argued before the trial court. It has, therefore, been waived."). In addition, the record fails to establish that the field interview cards actually identify informants. None of the City's witnesses reviewed the field interview cards prior to the show cause hearing and thus were not able to testify specifically concerning this issue. None of the field interview cards in the representative sample the City submitted include information identifying interviewees as informants or non-informants.

[13]A comparison of open records and open meetings laws may be found at The Reporters Committee for Freedom of the Press, Open Government Guide, http://www.rcfp.org/ogg/index.php (last visited May 22, 2007).

App. Ct. 1986); Globe Newspaper Co. v. Boston Ret. Board, 446 N.E.2d 1051, 1055 n.11 (Mass. 1983). One of the primary federal cases upon which the Court of Appeals relied observed that the law enforcement privilege is "largely incorporated" into FOIA. United States v. Myerson, 856 F.2d 481, 483-84 (2d Cir. 1988).

In contrast, the Public Records Act is not patterned upon FOIA. It provides specific statutory exceptions to disclosure, with more than a dozen such exceptions for the records of law enforcement agencies.[14] Significantly, none of these express exceptions incorporate the law enforcement privilege or otherwise bar disclosure of the field interview cards at issue in this appeal.

Not only is the Public Records Act distinct from FOIA and the open records laws of other states, the Middle Section of the Court of Appeals has expressly refused to recognize the law enforcement privilege as an exception to the Public Records Act, commenting that it lacks "logic and legal support." Swift, 159 S.W.3d at 576. Admittedly, the Court of Appeals' refusal to adopt the law enforcement privilege in Swift was not the primary basis for its decision. The Swift court had already concluded that the files were protected by Rule 16(a)(2). Nonetheless, the following rationale provided by the Swift court to explain its rejection of the privilege is persuasive:

[The State] points to no Tennessee law, statutory or otherwise, that purports to recognize this privilege, and it likewise does not explain how the contours of this privilege differ from the provisions of Tenn. R. Crim. P. 16(a)(2) which we have already discussed at length in Section V. Weighed against the clear state policy favoring the openness of governmental records, the State's efforts to convince us to recognize this new privilege fall short.

Id. at 578 (footnote omitted). In adopting the law enforcement privilege, the Court of Appeals in this case did not refute the convincing rationale Swift provided for its rejection.

In adopting the law enforcement privilege, the Court of Appeals in the instant case stated: "Given the importance of the interests protected by the law enforcement privilege, we find that it must be recognized under Tennessee common law." This statement indicates that the Court of Appeals failed to recognize the significance of this Court's prior decisions refusing to adopt "public policy" exceptions to the Public Records Act. Indeed, in Holt, this Court rejected a public policy exception that bears a striking resemblance to the law enforcement privilege the Court of Appeals herein adopted. See Holt, 710 S.W.2d at 517; Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d at 685 (describing Holt and stating that the Court rejected the public policy exception despite forceful arguments from the police department of the City of Memphis and "various *amicus curiae*" that subjecting closed investigative police files to public scrutiny "would result in greater reluctance of witnesses to criminal activity to talk with authorities, and to a concomitant reduction in the

---

[14]See, e. g., Tenn. Code Ann. §§ 10-7-503(e), -504(a)(2), (5), (8), (13), (14), (g), (h) (Supp. 2006), 37-1-153, -154 (Supp. 2006), -155, -409(a) (2005), -506 (Supp. 2006), -612(a) (2005), 40-6-304 (2006), 40-12-209 (2006), 56-53-109(c) (Supp. 2006), 62-27-124(c) (Supp. 2006), 62-35-131 (Supp. 2006).

effectiveness of law enforcement"); cf. City of New York v. Myerson, 856 F.2d 481, 484 (2d Cir. 1988) (stating that the law enforcement privilege is intended "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation").

More recently, we reiterated our unwillingness to judicially adopt public policy exceptions to the Public Records Act. In Cawood, we were urged to hold that a defendant's constitutional right to privacy required recognition of a public policy exception that would prevent disclosure of evidence introduced at the defendant's criminal trial on charges of attempting to patronize prostitution. 134 S.W.3d at 166. We declined "to make a public policy exception for the records" but recognized that "it is within the prerogative of the legislature to do so." Id. at 167.

Having examined the Public Records Act and prior Tennessee decisions, we conclude that the law enforcement privilege has not previously been adopted as a common law privilege in Tennessee and should not be adopted herein. As a result, the law enforcement privilege is not a "state law" exception to the Public Records Act.

Although we are sympathetic to the City's concerns about the potential consequences of disclosing the field interview cards, the General Assembly, not this Court, establishes the public policy of Tennessee. Cawood, 134 S.W.3d at 167. Whether the law enforcement privilege should be adopted as an exception to the Public Records Act is a question for the General Assembly.[15] Cf. Memphis Publ'g Co., 871 S.W.2d at 689 ("expressly invit[ing] the Legislature to remedy the underinclusiveness of § 10-7-504 by excepting the work product of county and municipal attorneys from public view").

Having concluded that the field interview cards are not protected by the law enforcement privilege, we must next consider Petitioners' assertion that they are entitled to full access to the field interview cards because the City relied exclusively upon the law enforcement privilege at the show cause hearing and failed to offer proof that the field interview cards are protected by Tennessee Rule of Criminal Procedure 16. The City responds that "at least some of the confidential field interview cards . . . are exempt from disclosure under Rule 16."[16]

---

[15]The City may wish to present this issue to the General Assembly, which, in 2006, adopted a joint resolution creating "a special joint committee to study the open government laws in the State of Tennessee." Act of May 27, 2006, ch. 887, § 1, 2006 Tenn. Pub. Acts 887.

[16]The City argues in its brief that "[t]he confidential field interview cards cannot be disclosed because the release of the information contained on the cards is constitutionally prohibited because interviewees have a constitutionally protected privacy interest in the information contained on the cards." The City failed to advance this argument in either the trial court or the Court of Appeals; thus, this argument has been waived. See Dye, 216 S.W.3d at 322. Additionally, the City has not established that it has standing to assert the constitutional claims of the interviewees. In the cases the City relies upon, the lawsuits were filed by the persons alleging constitutional violations. See, e.g., Kallstrom v. City of Columbus, 136 F.3d 1055, 1059 (6th Cir. 1998) (where plaintiffs, undercover police officers employed by the City

As the Court of Appeals correctly noted, the record on appeal is "undisputed that the field interview cards are separate from the files on matters under investigation." Interviewees may or may not be involved in an ongoing criminal investigation in some capacity, either as a suspect, a witness, or an informant, and the field interview cards do not indicate the status of interviewees. As previously explained, the field interview cards are "entered into the computer data base" and stored by "date and time." Each card includes blank lines on which officers may record the date, time, and reason for the investigative stop, the investigating officer's name and number, the interviewee's name, address, telephone number, date of birth, race, sex, height, weight, driver's license number, social security number, eye color, hair color, location of the interview, description of the interviewee's clothing, information about the interviewee's vehicle, if applicable, including year, make, model, license number, license type, license year, license state, and vehicle color. Typically, field interview cards include photographs of the interviewees. However, according to Lieutenant Willis, field interview cards do not include summaries of the officers' conversations with interviewees.

Petitioners are correct that the City failed to demonstrate which, if any, of the 369 field interview cards are involved in an ongoing criminal investigation and therefore exempt from disclosure under Tennessee Rule of Criminal Procedure 16(a)(2). Furthermore, the City's failure even to review the field interview cards for the purpose of identifying those cards or portions of cards containing information relevant to an ongoing criminal investigations is inexplicable, given that these cards would clearly have been exempt from disclosure under Rule 16(a)(2) and this Court's decision in Appman. We realize the City had little time to conduct such a review after the petition was filed because the show cause hearing was held less than two weeks later, in accordance with the statute. Tenn. Code Ann. § 10-7-505(b) (1999) ("Upon filing of the petition, the court shall, upon request of the petitioning party, issue an order requiring the defendant . . . to immediately appear and show cause, if they have any, why the petition should not be granted."). However, Petitioners first requested access to the field interview cards in July of 2004, almost seven months prior to the February 2005 show cause hearing. Thus, the City had more than sufficient time to conduct such a review.

Nonetheless, recognizing that harmful and irreversible consequences could potentially result

of Columbus, sued the City of Columbus for disseminating their personnel files, containing personal information, including home addresses and telephone numbers, to the defendants whom they had been investigating); Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, 274 F.3d 377, 394 (6th Cir. 2001) (where plaintiffs, adult entertainers, sued the Metropolitan Government challenging an ordinance that required them to submit their names and past and present addresses on applications that would be subject to disclosure via the Public Records Act). Finally, were we to assume that the City has standing to assert the constitutional claim, the City has failed to offer specific proof that disclosing the field interview cards would threaten the personal security and bodily integrity of certain interviewees, proof that is necessary to establish such a claim. See, e.g., Kallstrom, 136 F.3d at 1064 (stating that undercover officers had established a constitutional privacy interest in their personnel files by offering proof that release of the information in the files would "threaten[] the personal security and bodily integrity of the officers and their family members"); Deja Vu of Nashville, Inc., 274 F.3d at 395 (holding that adult entertainers had established a constitutional privacy interest by offering proof that disclosing their names and current and past residential addresses would pose serious potential risks to their physical safety and well-being).

from disclosing files that are involved in a pending criminal investigation, we conclude that a remand to the trial court is appropriate to allow the City an opportunity to review the field interview cards and to submit to the trial court for *in camera* review those cards or portions of cards which the City maintains are involved in an ongoing criminal investigation and exempt from disclosure. Petitioners shall be granted immediate access to all field interview cards not submitted to the trial court for *in camera* review.

The trial court shall determine which of the field interview cards or portions of them are exempt from disclosure. An entire field interview card should not be deemed exempt simply because it contains some exempt information. Rather, redaction of the exempt information is appropriate. Eldridge, 86 S.W.3d at 574 (holding that County could redact from public records any information made confidential by statute with "[a]ny redaction . . . subject to review by the chancellor"). The trial court has discretion to prescribe additional procedures as necessary to govern the proceedings on remand. The entire process should be concluded as expeditiously as possible. Because almost three years has passed since the first request for this information, we encourage the trial court to impose upon the City an expedited schedule for completion of its review of the field interview cards.

## III. ATTORNEYS' FEES

We must also consider whether Petitioners are entitled to recover the attorneys' fees they have incurred in seeking access to the field interview cards and to the Diamond Jaxx financial records. The Public Records Act provides as follows concerning recovery of attorneys' fees:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.

Tenn. Code Ann. § 10-7-505(g) (1999). The element of "willfully" required by this statute has been described as synonymous to a bad faith requirement. Arnold, 19 S.W.3d at 789. Stated differently, the Public Records Act does not authorize a recovery of attorneys' fees if the withholding governmental entity acts with a good faith belief that the records are excepted from the disclosure. Id. Moreover, in assessing willfulness, Tennessee courts must not impute to a governmental entity the "duty to foretell an uncertain juridical future." Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d at 689.

Petitioners contend that the City's reliance upon a common law privilege that had not been adopted in Tennessee, its decision to ignore Holt and Appman, its failure even to review the field interview cards to determine whether any were part of an ongoing criminal investigation, and its blanket assertion that the field interview cards "are privileged, period," show a blatant disregard for the law and evidence the City's willful, bad faith refusal to fulfill its obligations under the Public

Records Act.

Petitioners claim that the City's actions concerning the Diamond Jaxx financial records also evidence a willful, bad faith refusal to comply with the Public Records Act. Specifically, Petitioners maintain that the City's claim that it did not receive the Diamond Jaxx financial records until shortly before the show cause hearing is belied by the dates appearing on the documents themselves.[17]

The City responds that it had a good faith belief that the field interview cards were protected by the law enforcement privilege and a good faith belief that the Diamond Jaxx financial documents were protected by the confidentiality clause of the stadium lease agreement and the statutory exception for "[s]tate agency records containing opinions of value of real and personal property intended to be acquired for a public purpose." Tenn. Code Ann. § 10-7-504(a)(6) (Supp. 2006).

We conclude that the record supports the trial court's determination that Petitioners are entitled to recover attorneys' fees and the trial court's award of attorneys' fees. Petitioners requested the field interview cards on two occasions, yet the City never reviewed the cards. Rather, the City maintained that the field interview cards were exempt "period," pursuant to a common law privilege that had neither been adopted in Tennessee nor even mentioned in a Tennessee case, and which had been implicitly rejected in Holt. Moreover, the City asserted the law enforcement privilege as if it were a blanket privilege, yet the Court of Appeals, and other jurisdictions in which it is applied, emphasize that the law enforcement privilege is a qualified privilege and does not under any circumstances provide blanket protection to governmental records. See, e.g., City of New York v. Beretta U.S.A. Corp., 222 F.R.D. 51, 66 (E.D.N.Y. 2004). Thus, recognizing that at least a portion of the field interview cards were subject to disclosure would not have required the City "to foretell an uncertain juridical future." Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d at 689. The record supports the trial court's finding the City willfully refused to disclose the field interview cards.

Petitioners also are correct that the dates appearing on the Diamond Jaxx financial records indicate that the City had possession of them when Petitioners requested access. The City's reliance upon the contractual confidentiality clause and statutory exception to the Public Records Act to support its refusal to disclose these documents is misplaced. As previously noted, the contractual confidentiality clause provided as follows:

---

[17]Petitioners are referring to two letters from the president of Lozinak Baseball to the City's mayor dated October 18, 2004, and the "Ticket Sales Report Sheet" referred to in one of the letters. Additionally, Petitioners maintain that the following documents were all in the City's possession when Petitioners requested access: a document titled "Lozinak Baseball Properties LLC Statement of Operations for the Year Ended December 31, 2003"; a document titled "Lozinak Baseball Properties LLC Balance Sheet December 31, 2003"; a document titled "Lozinak Baseball Properties LLC Statement of Cash Flows for the Year Ended December 31, 2003"; a document titled "Lozinak Baseball Properties LLC Statement of Operating Expenses for the Year Ended December 31, 2003"; and the five documents entitled "Lozinak Baseball Properties LLC Notes to Financial Statements December 31, 2003."

-15-

N.  Books, Records, and Accountings . . . . The City shall have the right to make inspections of the books and records of [Lozinak Baseball] from time to time for purposes of verifying the accuracy of the accounting procedures and revenues to be derived by the City from the Stadium.  The City's right of inspection shall be subject to its agreement to (i) refrain from making copies of any of [Lozinak Baseball's] records except as permitted by [Lozinak Baseball], such permission not to be reasonably withheld, delayed or conditioned and (ii) hold all information obtained as a result of such inspection confidential and to not disseminate any such information to any third party without [Lozinak Baseball's] approval *except as otherwise required under the Tennessee Open Records Law.*

(Emphasis added.)  The confidentiality clause is expressly subject to the Public Records Act and may not serve as a basis for nondisclosure.  Tennessee Code Annotated section 10-7-504(a)(6) exempts from disclosure records "containing opinions of value of real and personal property intended to be acquired for a public purpose" and provides that such records "shall not be open for public inspection until the acquisition thereof has been finalized."  However, the Diamond Jaxx fianancial records did not contain opinions about the value of property.  At most these financial records contained information that would likely have been required to determine the value of the Diamond Jaxx; the records did not include *opinions* concerning the value of the Diamond Jaxx.  Thus, this statutory exception clearly did not apply to the Diamond Jaxx financial records.  Again, the record supports the trial court's finding that the City willfully refused to comply with the Public Records Act by disclosing these financial records.

Accordingly, we hold that the record supports both the trial court's determination that Petitioners are entitled to recover their attorneys' fees and the trial court's award of attorneys' fees in the amount of $6,170.   Additionally, we instruct the trial court on remand to calculate and to award Petitioners the attorneys' fees they have incurred on appeal.

## IV.  PERMANENT INJUNCTION

Lastly we consider whether the trial court erred by issuing a permanent injunction requiring the City prospectively to respond in writing to all future written public records requests from *The Jackson Sun* or its agents and to explain whether the record sought would be produced and, if not, the basis for nondisclosure.  The Court of Appeals vacated this injunction, stating that it was not authorized by the Public Records Act.  Petitioners argue that the permanent injunction is authorized by Tennessee Code Annotated section 10-7-505(d) (1999), which provides:

The court, in ruling upon the petition of any party proceeding hereunder, shall render written findings of fact and conclusions of law and *shall be empowered to exercise full injunctive remedies and relief to secure the purposes and intentions of this section*, and this section shall be broadly construed so as to give the fullest possible public access to public records.

(Emphasis added.) We agree with Petitioners that this statute authorizes the injunction issued by the trial court. This statute plainly and in unambiguous language confers upon courts broad powers to grant injunctive remedies that secure the purposes and intentions of the Public Records Act. The permanent injunction issued in this case directly remedies the City's failure to respond to Petitioners' multiple requests for public records. Requiring the City to provide a written response articulating its reasons for nondisclosure will secure the purposes of the Public Records Act by ensuring that the City denies such requests only after thoughtful and careful consideration. The permanent injunction issued by the trial court therefore is reinstated.

## V. CONCLUSION

We hold that the law enforcement privilege is not part of Tennessee common law and therefore does not operate as a "state law" exception to the Public Records Act. Accordingly, we reverse the judgment of the Court of Appeals; however, we remand this case to the trial court to determine whether any field interview card or portion thereof is exempt from disclosure as part of a pending, open, or ongoing criminal investigation. We also reverse the Court of Appeals' judgment and reinstate the trial court's judgment finding that Petitioners are entitled to recover attorneys' fees and the trial court's judgment awarding Petitioners' attorneys' fees of $6,170. On remand the trial court shall calculate the reasonable award of attorneys' fees which Petitioners incurred and are entitled to recover for the appellate proceedings. Finally, we reinstate the permanent injunction issued by the trial court. Costs of this appeal are taxed to the City of Jackson, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE