# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 28, 2007 Session

## JOHN C. KERSEY, SR. v. JOHN BRATCHER, ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 05-1491MI     Donald P. Harris, Senior Judge**

---

**No. M2006-01319-COA-R3-CV - Filed September 14, 2007**

---

SHARON G. LEE, J., dissenting.

I respectfully dissent from the majority's opinion in this Public Records Act case. I would reverse the trial court's dismissal of the claim against the Clerk and Master and the deputy clerk and vacate the grant of summary judgment as to the judge's assistant.

*The Clerk and Master and Deputy Clerk's Motion to Dismiss*

I conclude after reviewing the allegations in Mr. Kersey's complaint, which we must take as true when reviewing a motion to dismiss, that Mr. Kersey has stated a claim for which relief can be granted under the Public Records Act.

Mr. Kersey alleges the following facts in his verified complaint:

1)  The Defendant, John Bratcher, as the Clerk and Master of Rutherford County, has the responsibility to maintain all files for the Chancery Court and the duty to provide public records to anyone who requests to review or copy said records.

2)  All records of the Chancery Court for Rutherford County are open for public inspection or copying unless such records are sealed by a judge under a special exception of Tennessee law.

3)  The Defendant, Beverly Raechelle Wilson, is a deputy clerk in the Clerk and Master's office and is under the direct supervision of the Clerk and Master.

4)  Mr. Kersey went to the Clerk and Master's office and asked a deputy clerk if a case had been filed under the name of Mary Ester Bell. After checking the computer, the deputy clerk responded that a divorce had been recently filed under the name of Mary Ester Bell.

5) Mr. Kersey asked to see the divorce file. During the initial discussion, the deputy clerk Wilson intervened and told Mr. Kersey the file was unavailable.

6) Mr. Kersey anticipated such a response because he had observed that in years past, if a person of strong political power or one of his or her family members became involved in a lawsuit, the judge in whose court the lawsuit was filed would, on his own motion, recuse himself. This first judge would then send the file to another judge, presumably with some type of note attached identifying the important person, and asking that judge to consider recusal. The second judge would review the file, once he had time and was not in court. He would then make a decision about recusal in due time, and send the file on to a third judge without being in any big rush. By this procedure, the judges could keep the file tied up for days, if not for weeks.

7) Mr. Kersey knew that Mary Ester Bell was an elected official of the Town of Smyrna, Tennessee.

8) Mr. Kersey knew that Mary Ester Bell's father was a prominent citizen of Smyrna, who for many years was heavily involved in the politics of Rutherford County.

9) Mr. Kersey was informed that the "Judge" had the file. He assumed that this meant that Chancellor Corlew had the file.

10) Mr. Kersey asked if the case was set for today, which was Thursday, and was advised it was set for the next day, Friday. Mr. Kersey again requested the file since the case was not being heard that day but the next day.

11) Deputy clerk Wilson went into another office and was seen talking to another deputy clerk. She returned and told Mr. Kersey that the file was unavailable because the Judge had decided to recuse himself from the case and had sent the case on to another judge. She told him that if he came back Friday afternoon, the file "might" be available.

12) When Mr. Kersey insisted that deputy clerk Wilson tell him which judge had the file, she asked him why he wanted to see the file. He responded that it was none of her business; that it was a public record; and he did not have to give a reason for wanting to see the file.

13) Deputy clerk Wilson then called Clerk and Master Bratcher. While holding the telephone in one hand, she advised Mr. Kersey that Clerk and Master Bratcher wanted to know why he wanted to see the file. Again Mr. Kersey refused to divulge his reason.

14) Deputy clerk Wilson then told Mr. Kersey that he would have to see the Clerk and Master, whose office was on the fifth floor in Room 502. As Mr. Kersey proceeded up the steps from the clerk's office on the third floor to the fifth floor, he was met by two sheriff's department officers who were running as if some special emergency had occurred. Upon reaching the fifth

floor, Mr. Kersey went to Room 502 and asked to see Clerk and Master Bratcher. He was told by one of the ladies in the office, "Please have a seat. Mr. Bratcher will be in shortly."

15) A few minutes later, Clerk and Master Bratcher entered the office and was accompanied by the two sheriff's department officers who had passed Mr. Kersey minutes earlier on the stairs. Clerk and Master Bratcher asked him if he was Mr. Kersey and he responded he was. Clerk and Master Bratcher then asked him what he wanted. Mr. Kersey was surprised by this question since the Clerk and Master's telephone conversation with the deputy clerk had occurred only minutes earlier and he knew what Mr. Kersey wanted. Mr. Kersey was told that Judge Rogers had the file. Mr. Kersey continued to insist on seeing the file. In response, Clerk and Master Bratcher called Judge Rogers' office. At the end of the conversation, the Clerk and Master ordered the two sheriff's department deputies to escort Mr. Kersey to Judge Rogers' office.

16) Deputy clerk Wilson called the sheriff's deputies after Mr. Kersey left the clerk's office, and the purpose of their presence was to intimidate him because he was seeking to review a file of a public person.

17) Mr. Kersey, surrounded by the two sheriff's deputies, then proceeded back to the second floor and entered Judge Rogers' office.

18) Upon entering the office, Mr. Kersey was met by Defendant Blaylock, whom Mr. Kersey describes as a "very hostile, almost irate individual." With an outstretched arm and a pointing index finger, she ordered Mr. Kersey, "You go over there (pointing to a couch) and sit down and I will allow you to see the file." Mr. Kersey responded, "You don't give me orders! I will stand and review the file."

19) Moments later, Mr. Kersey was ordered by a sheriff's deputy to leave the office and was escorted out of the building and forced to leave. He was never allowed to see the divorce file.

Mr. Kersey filed this lawsuit pursuant to the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503, *et seq.*, which governs the right of access to public records in this state. The Act mandates that "all state, county and municipal records . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records *shall not* refuse such right of inspection to any citizen, unless otherwise provided by state law." Tenn. Code Ann. § 10-7-503(a) (Supp. 2006) (emphasis added). If access to public records is denied, judicial review is available. Tenn. Code Ann. § 10-7-505(a). If such a lawsuit is filed, the governmental entity bears the burden of proof and must justify its failure to disclose the record by a preponderance of the evidence. Tenn. Code Ann. § 10-7-505(c).

The General Assembly has explicitly stated that the Public Records Act "shall be broadly construed so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d). The Tennessee Supreme Court has upheld this legislative mandate and sent a very clear message in several cases that public records should be available to citizens upon request. *See, e.g.,*

*Schneider v. City of Jackson*, 226 S.W.3d 332 (Tenn. 2007); *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681 (Tenn. 1994); *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513 (Tenn. 1986).

Although there are some exceptions to the Act,[1] none are applicable in this case. The divorce file was clearly a public record, and the parties do not dispute its designation as such. We begin with the premise that all nonexempt public records are open for inspection at all times during business hours by all citizens. The Act does not give public officials discretion to choose whether to comply or who may inspect the records. However, we know from experience and common sense that not all records are immediately available all the time.[2] The Act does not address the proper governmental response when records are in use or temporarily unavailable. We must, therefore, read into the Act a reasonableness provision that records that are not immediately available will be provided in a reasonable amount of time. In fact, we have previously stated as follows regarding records from which confidential information must be redacted prior to allowing public access:

> [I]t is logical to conclude that if a governmental entity or an agent thereof is unable to immediately satisfy a citizen's request for access to a public record pursuant to the Public Records Act because confidential information must be redacted from the document(s), then it should, at the time of the request, inform the citizen that access to the record will be allowed and also explain the reason for any delay in production of the document. The entity or its agent should also provide a time when the citizen will be able to view the record or may, instead, collect contact information from the citizen and notify him or her when the redaction is complete.

*Kersey v. Jones*, No. M2006-01321-COA-R3-CV, 2007 WL 2198329, at *5 (Tenn. Ct. App. M.S., filed July 23, 2007). I see no reason why this procedure should be limited to public records which are temporarily unavailable because of the redaction process. Indeed, it would not have inconvenienced the Defendants in this case to determine and convey to Mr. Kersey a definite time when he could return to view the file, rather than sending him from office to office in an apparent scavenger hunt for the record he had requested.

---

[1] For some examples of records which are not subject to disclosure pursuant to the Public Records Act, see Tenn. Code Ann. § 10-7-504.

[2] In fact, state law requires the redaction of certain confidential information from otherwise public records before they may be inspected by the public. *See* Tenn. Code Ann. § 10-7-504(f) (requiring redaction of certain personal information, such as telephone and social security numbers, from the personnel records of government employees). We have held that under those circumstances, a citizen may not be entitled to immediate access to a public record, although access to the file should not be delayed longer than the time necessary to redact the confidential information from the requested records. *Kersey v. Jones*, No. M2006-01321-COA-R3-CV, 2007 WL 2198329, at *4-5 (Tenn. Ct. App. M.S., filed July 23, 2007).

The public's right to access records cannot be circumvented or obstructed by allowing governmental officials to play a shell game with public records or otherwise make the records "unavailable" for review. This is essentially what Mr. Kersey alleges occurred in this case, and we must, for the purposes of a motion to dismiss, take this allegation as true. Denial of access to a public record need not be an outright refusal to allow an inspection. It can also occur when a records custodian declares that a record is "unavailable," when in fact the record is available, or when a records custodian makes the process of obtaining access to a requested record too difficult or cumbersome for a citizen. Either way, the end result is the same – a citizen is denied access to public records in violation of state law. In this case, although the clerks did not tell Mr. Kersey directly that he was not allowed to see the divorce file, their combined actions certainly had the effect of denial of access.

Mr. Kersey should not have been made to run through a gauntlet of obstacles to view a public record. He first asked to see the divorce file, which he had a right to inspect. He was told the file was unavailable, then told the judge had the file, then told the case was set for the next day, then, following a conversation between clerks in the next room, he was told that the Judge had recused himself and had sent the file to another judge. Thereupon Mr. Kersey was told that if he returned Friday, which would have been after the hearing, he *might* – not *would* – be able to view the file. When Mr. Kersey continued to insist on seeing the file, he was asked why he wanted to see the file. Mr. Kersey, quite appropriately, responded that it was none of the clerk's business, that it was a public record, and he did not have to have a reason. When the Clerk and Master was called, he also inquired as to the reason for the request. Again, Mr. Kersey refused to divulge his reason. Mr. Kersey was then sent to the fifth floor to the Clerk and Master's office. Climbing the stairs, he was met by two sheriff's deputies running as if responding to an emergency. When he arrived at the Clerk and Master's office, Mr. Kersey again had to explain what he wanted. He was told that Judge Rogers had the file, and Mr. Kersey once again insisted on seeing the file. At this point, the Clerk and Master, who is the official custodian of the record, sent Mr. Kersey, escorted by sheriff's deputies, to the judge's office, rather than retrieving the record himself. Upon his arrival, Mr. Kersey was told by a hostile, irate court employee to sit down and "I will *allow* you to see the file." When Mr. Kersey refused to sit on the couch, he was ordered to leave and escorted out of the building by the sheriff's deputies.

In the event that a public record is not immediately available for review, a citizen should not be given confusing, protracted, and inconsistent explanations as to where the requested file is and why it is unavailable. The response to Mr. Kersey's request to view a public record was contrary to the spirit and the letter of the Public Records Act. Compliance with the Act should minimize or eliminate unpleasant encounters, such as the one experienced by Mr. Kersey. Noncompliance with the Act, on the other hand, breeds mistrust of governmental entities and officials. A person seeking to inspect a public record should not be questioned once – and certainly not twice, as in this case – about why he or she wants to view the record. Such inquiries are improper and imply that the "correct" answer will be the key that will unlock the "vault" of public records.

From the facts alleged in the complaint, it is my opinion that Mr. Kersey should be allowed

his day in court and that the Defendants should be required to prove a legal basis for their nondisclosure of the court file, as required by the Public Records Act.

*Summary Judgment as to the Judge's Assistant*

Because it is my opinion that there was a disputed question of material fact as to whether the judge's assistant, Ms. Blaylock, as the designee of the Clerk and Master, complied with the Act, I would reverse the grant of summary judgment to her. If the only undisputed fact was that Mr. Kersey refused to sit in the spot she indicated while he inspected the divorce file, then I would agree with the majority. But the facts must be viewed in their totality, and the events leading up to verbal exchange must be considered. Mr. Kersey describes the assistant as a "very hostile, almost irate individual" who "ordered" him to sit with an "outstretched arm and a pointing index finger." Ms. Blaylock was at least the fifth person Mr. Kersey had spoken to about the record, her office was the third office he had visited in search of the record, and he was escorted there by two sheriff's deputies. Governmental officials should not be allowed to manufacture a situation wherein a citizen must go from place to place seeking a public record while receiving confusing and inconsistent responses from the very employees who are supposed to facilitate retrieval of the record, and then escape blame when the citizen becomes upset and exasperated because of their refusal to make the record available. A factual question certainly exists as to whether that is the situation that occurred in this case, and therefore, summary judgment is inappropriate.

In conclusion, I would vacate the dismissal of Mr. Kersey's claims against Mr. Bratcher and Ms. Wilson, as Clerk and Master and deputy clerk, and vacate the grant of summary judgment to Judge Rogers' assistant, Ms. Blaylock.

 

 

_____
SHARON G. LEE, JUDGE