# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 30, 2025 Session

## CLATA RENEE BREWER ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 23-538-III        I'Ashea L. Myles, Chancellor**

_____

### No. M2024-01139-COA-R3-CV

_____

In the spring of 2023, The Metro Nashville Police Department ("Metro") received several public records requests seeking information about a school shooting that occurred in a Nashville private school on March 27, 2023. Metro denied all such requests. The various requestors filed petitions for access to the records in the Davidson County courts, which were eventually consolidated into one action. The private school at which the shooting occurred, its affiliated church, and parents of surviving children intervened in the action as parties. These intervening parties advocated that the school shooter's personal writings and other creative works, which Metro collected in the course of its investigation, should remain confidential. The trial court ultimately denied all petitions for access to Metro's file for numerous reasons. The requestors appeal to this Court. Following our review, we affirm in part and reverse in part. We affirm the trial court's finding that the intervening parents have standing to raise arguments under the United States Copyright Act. We also affirm the trial court's finding that neither Article I, section 35 of the Tennessee Constitution, nor Tennessee Code Annotated section 40-38-102, bar disclosure of any public records in this case. On all other issues, we reverse the trial court. The case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J., E.S., and THOMAS R. FRIERSON, II, J., joined.

John I. Harris III, Nashville, Tennessee, for the appellants, James Hammond and The Tennessee Firearms Association.

Paul J. Krog, Brentwood, Tennessee; and Nicholas R. Barry, Washington, DC, for the appellants, Michael Patrick Leahy and Star News Digital Media, Inc.

Richard L. Hollow, Knoxville, Tennessee, for the appellant, Todd Gardenhire.

Eric G. Osborne, Rascoe S. Dean, William L. Harbison, Christopher C. Sabis, C. Dewey Branstetter, Ryan T. Holt, Micah N. Bradley, Hunter C. Branstetter, William D. Pugh, Edward M. Yarbrough, Hal Hardin, and Mark J. Patterson, Nashville, Tennessee, for the appellees, Parents of Minor Covenant Students Jane Doe and John Doe.

Lora Barkenbus Fox and Cynthia E. Gross, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County, Tennessee.

Rocklan W. King III, F. Laurens Brock, and Stacia M. Daigle, Nashville, Tennessee, for the appellee, Covenant Presbyterian Church.

Peter F. Klett and Autumn L. Gentry, Nashville, Tennessee; and Nader Baydoun and Stephen Knight, Brentwood, Tennessee, for the appellee, The Covenant School.

Michael B. Bressman and Jennifer Safstrom, Nashville, Tennessee, for the amici curiae, Intellectual Property and First Amendment Scholars and Advocates in support of appellants.

Samuel P. Funk, James K. Vines, and Evan S. Rothey, Nashville, Tennessee, for the amici curiae, Franklin Road Academy, Montgomery Bell Academy, Oak Hill School, and St. Paul Christian Academy in support of appellees.

## OPINION

### BACKGROUND

This case stems from the tragic shooting that occurred at The Covenant School ("Covenant School" or "the School") in Nashville, Tennessee, on March 27, 2023. After killing six victims within the School, including three children, the perpetrator (or, the "shooter") was shot and killed by responding Metro police officers. Following the deadly event, several individuals and entities lodged requests for information from Metro pursuant to the Tennessee Public Records Act (the "TPRA"). *See* Tenn. Code Ann. § 10-7-501 *et seq*. *The Tennessean* requested the police reports "with [the shooter] named[;]" the report for the initial response to Covenant School on March 27, 2023; "[a]ll documents in [the shooter's] possession immediately prior to [her] death, including the car and home, including journals and hand-drawn maps[;]" and "copies of any search warrants filed on [the shooter's] home[.]" State Senator Todd Gardenhire filed a TPRA request on April 12, 2023, seeking essentially the same information. James Hammond and the Tennessee

- 2 -

Firearms Association, Inc. (the "TFA") also submitted a total of three public records requests, seeking to inspect or obtain copies of public records related to the events at the School, including the shooter's written "manifesto." Additional individuals and organizations, including Judicial Watch, Inc., Ms. Clata Brewer, the National Police Association, Inc., Michael Patrick Leahy, and Star News Digital Media, Inc. ("Star News"),[1] all filed TPRA requests seeking information about March 27, 2023, and the deceased shooter. Of particular interest to the requestors are the shooter's journals and personal writings, some of which Metro confiscated from her car the day of the shooting. According to a lengthy investigative report later released by Metro, the shooter began journaling several years prior to the shooting, and Metro's file is voluminous.

Metro denied all records requests, citing Tennessee Rule of Criminal Procedure 16 and stating that its investigation into the shooting remained ongoing. Eventually, several petitions for access to the records were filed in the Davidson County courts, and "[t]he petitions were subsequently transferred to the Davidson County Chancery Court, Part III ('trial court'), and consolidated into one action." *Brewer v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2023-00788-COA-R3-CV, 2023 WL 8281582, at *1 (Tenn. Ct. App. Nov. 30, 2023) (hereinafter, "*Brewer I*").

On May 12, 2023, Covenant Presbyterian Church (the "Church" or "Covenant Church"), which houses and operates the School, filed a motion to intervene in the consolidated TPRA action, asserting that "[t]he records sought . . . may include and/or relate to information owned by Covenant Church, including, but not limited to, schematics of church facilities and confidential information pertaining to Covenant Church employees." On May 15, 2023, and May 17, 2023, respectively, Covenant School and parents of Covenant School students ("the Parents" or the "Covenant Parents") followed suit and filed motions for intervention. They raised similar arguments as Covenant Church. The requestors opposed intervention, but in an order entered May 24, 2023, the trial court allowed the Church, the School, and the Parents (together, the "Covenant Intervenors") to intervene as parties pursuant to Tennessee Rule of Civil Procedure 24.02. Several requestors appealed that ruling,[2] and a dispute ensued in the trial court regarding whether the case could proceed while the appeal remained pending in this Court.

In another order entered May 24, 2023, the trial court directed Metro "to file pursuant to a Notice of Filing, a list setting forth all exemptions to the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-501, et seq. and any other legal authority that it will raise . . . as support for limiting the public release of the records requested by Petitioners."

---

[1] Mr. Hammond is the former sheriff for Hamilton County, Tennessee. Mr. Leahy is the CEO of Star News.

[2] Tennessee Rule of Civil Procedure 24.05 provides: "Any order granting or denying a motion to intervene filed pursuant to this rule shall be a final judgment for purposes of Tenn. R. App. P. 3."

The trial court allowed Metro to put forth any additional TPRA exemptions on which it intended to rely in refusing to turn over its records. Metro filed the notice on May 24, 2023, listing five purported TPRA exemptions: 1) Tennessee Rule of Criminal Procedure 16 addressing open investigations; 2) Tennessee Code Annotated section 10-7-504(a)(29)(A) addressing personally identifying information; 3) Tennessee Code Annotated section 10-7-504(p) addressing school security; 4) Tennessee Code Annotated section 10-7-504(t) concerning crime victims who are minors; and 5) Tennessee Code Annotated section 38-7-110(c) addressing medical records of deceased persons.

In the interim, the Covenant Intervenors filed briefs opposing the requests for Metro's records. In a brief filed on May 30, 2023, Covenant Church requested that the trial court deny Petitioners' requests or, in the alternative, redact sensitive information from the disclosures:

> Because of the ongoing criminal investigation, the Court should deny Petitioners' request for records. By the time this matter is heard on June 8, 2023, it will only have been 73 days since the March 27, 2023 attack. The victims of that attack deserve time so this crime may be investigated. And, Tennessee law affords them that time. Finally, even if the Court is inclined to produce some records in a redacted form, the Court should withhold any information relating to the security at the Church and School, along with any employee information for the Church's employees.

The Church maintained that no information should be disclosed insofar as Metro continued to investigate the shooting. In the alternative, the Church argued that the "school security" exception, found at Tennessee Code Annotated section 10-7-504(p), exempts from disclosure any information regarding Covenant School's security system.[3] The Church also urged that any personal or private information about church personnel should be exempted under the TPRA's "catch-all" provision. *See* Tenn. Code Ann. § 10-7-503(a)(2)(A). Covenant School's brief, also filed on May 30, 2023, raises similar arguments. The School maintained that "the shooter's writings, as well as any other documents relating to the School's safety or security be excluded from the documents produced in response to Petitioners' TPRA request." The School urged that Metro's investigation "remain[ed] active" and that it "ha[d] yet to confirm no other actors were involved in the horrific attack." Also citing school security, Covenant School urged that "[t]he perpetrator's writings are critical to [Metro's] *ongoing* investigation and therefore, are connected to the Covenant School's security. Moreover, the release of the perpetrator's writings increases the risk of a 'copycat' or subsequent attack."

---

[3] Covenant Church pointed out that the School and the Church share a security system and have overlapping security features.

- 4 -

The Covenant Parents also filed a brief in opposition to Petitioners' requests. According to the Parents, the shooter's writings and "anything else that is likely to inspire future attacks should *never* be publicly released because doing so will violate [the Parents'] rights as victims under the Tennessee Constitution and other applicable Tennessee law, is contrary to multiple exceptions to the Tennessee Public Records Act, Tennessee Code Annotated §§ 10-7-503 *et seq*. . . . and will likely lead to future attacks and the unnecessary loss of additional innocent life." (Emphasis added). The Parents opined that the trial court should

> exercise caution in releasing information about internet sites visited by the shooter or files downloaded by the shooter to the extent such information would implicitly give the shooter a voice with which to haunt her victims and potentially inspire troubled individuals to access those same sources. The Parents ask that any such records not be released.

In support of the above-listed arguments, the Covenant Parents argued that Rule 16, as well as the school security exception to the TPRA, barred disclosure of the shooter's writings. They also argued that the Tennessee Constitution and the Tennessee Victims' Bill of Rights prevent disclosure because the shooter's victims have "the right to be free from the intimidation, harassment, and abuse that would come from release of the shooter's writings and the other documents identified by the Parents." Finally, Metro also filed a brief in opposition to the TPRA requests, arguing that its records should not be produced for the reasons listed in its May 24, 2023 notice.

The requestors all filed briefs in support of their records requests. Mr. Hammond and the TFA filed a brief in support on June 2, 2023, arguing that the only issue properly before the trial court was whether Metro appropriately denied the relevant requests pursuant to Rule 16. Hammond and the TFA took issue with the fact that Metro and the Covenant Intervenors raised "new" TPRA exemptions after access was sought in the trial court. According to Hammond and the TFA, "[t]here is no authority extending Rule 16(a)(2) to an incident in which there are no criminal proceedings, person of interest, or target, pending or contemplated." The TFA and Hammond next asserted that the school security exception does not apply in this case because Covenant School is a private school and not a public entity subject to the TPRA. These petitioners asserted that the Covenant Intervenors' "generalized claim that all of [the shooter's] writings are subject to the school security exception sweeps far too broadly and is devoid of any tie to a particular, responsive record." While Hammond and the TFA agreed that some information in the files may need to be redacted, as the records contain personally identifying information or information regarding minors, they argued that the requestors would work with Metro in good faith to keep such information confidential. As to the Parents' assertion that they are entitled to relief under the Victims' Bill of Rights, the TFA and Hammond asserted that the Parents' position is "long on rhetoric" but short on law.

- 5 -

Mr. Leahy and Star News also filed a memorandum in support of their requests. These requestors made "a limited request" asking for the shooter's writings as well as "the autopsy and toxicology reports obtained by [Metro]." According to Mr. Leahy and Star News, these items are, unequivocally, public records to which no TPRA exceptions apply. Regarding the Parents' constitutional arguments, Mr. Leahy and Star News argued that the Parents were essentially asking the trial court to create a policy-based exception to the TPRA, something the trial court is not at liberty to do. In a brief filed shortly thereafter, *The Tennessean* and Senator Gardenhire raised similar arguments.[4]

On June 12, 2023, the shooter's surviving parents filed a notice of limited appearance in the trial court. This notice informs the trial court that the shooter's parents assigned their rights in their daughter's writings to another party. Two days later, the shooter's parents filed a document titled "Assignment and Transfer of Legal and Equitable Title to Certain Personal and Intellectual Property Created by [the shooter]." This document provides that the parents, in their capacity as next of kin and beneficiaries of the shooter's intestate estate,

> [i]rrevocably assign and transfer all of their equitable, legal, and other rights in the Writings and Intellectual Property Rights (including all tangible copies thereof) as a gift to the Parents in trust for the benefit of the Children, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement or misappropriation of any of the Intellectual Property Rights, for the express purpose of preventing harm to the Children including preventing dissemination of the writings and to pursue all legal rights and remedies available[.]

Essentially, the shooter's parents transferred any intellectual property interest in the disputed writings to a trust to be held for the benefit of the Covenant Parents' children. *The Tennessean* and Senator Gardenhire opposed the shooter's parents' limited appearance in the case, asserting that the parents lacked standing and that the shooter's estate had not been properly administered such that the assets were even transferrable. However, on July 7, 2023, the trial court entered an order staying any further proceedings in the trial court pending this Court's ruling on intervention. We upheld the trial court's ruling on intervention in an opinion filed on November 30, 2023. *Brewer I*, 2023 WL 8281582, at *2.

After this Court issued the mandate for *Brewer I* on January 3, 2024, petitioner Clata Brewer, who is not participating in the present appeal, filed a motion requesting that the

---

[4] Throughout their filings in the trial court, the requestors incorporate and adopt one another's arguments.

trial court "set this matter for an expeditious show cause hearing as required by the [TPRA]." The requestors, Metro, and the Covenant Intervenors continued filing exhibits in support of their respective positions. The Covenant Intervenors filed declarations of several Covenant Parents, as well as articles and other materials discussing the risks associated with a school shooter's writings being disseminated. To summarize the voluminous appellate record, the Parents maintain that distribution of a mass shooter's writing or "manifesto" tends to lead to more mass shootings. The Parents further argued in their supplemental briefing that the shooter's estate is "drawing to a close and will soon result in the ownership of the writings passing to the Parents in trust for the purpose of protecting their children." Covenant School filed a supplemental brief adopting and incorporating the Parents' arguments. The School also asserted that the shooter's writings are protected by federal copyright law, noting that "[c]opyright protection applies from the time a work is created. . . . However repugnant, the shooter's writings are original works of authorship fixed in a tangible medium and they are therefore subject to copyright protection."

The requestors responded with amended supplemental briefing, largely reiterating the same arguments and maintaining that the copyright argument lacks merit. In particular, *The Tennessean*[5] and Senator Gardenhire argued that the shooter's parents lacked standing to file the assignment, that the trial court, as a state court, lacked jurisdiction to adjudicate a copyright issue, and that the TPRA does not contain a copyright exception.

On April 11, 2024, the parties filed a joint stipulation providing as follows:

> Petitioners, Metropolitan Government of Nashville and Davidson County ("Respondent"), and Intervenors jointly stipulate and hereby agree that Petitioners are not seeking and that no photos, videos, or other images of children or of any deceased persons should be released to the public. The parties respectfully request that this Court affirm in its final order that no such photos should be released.

The trial court held a show cause hearing on the disputed records over two consecutive days on April 16 and 17, 2024. The trial court entered its memorandum and final order on July 4, 2024, concluding that Metro's file on the shooting is totally exempt from disclosure. The trial court found that otherwise public records may be excluded from disclosure under the TPRA pursuant to Tennessee Rule of Criminal Procedure 16. In this case, the record contains affidavits from Metro officers providing that some aspects of the investigation were still underway at the time of the show cause hearing, namely, whether the shooter acted alone and whether she had any assistance in obtaining her weapons.

---

[5] Although it actively participated in the proceedings below, *The Tennessean* is not participating in the present appeal.

Accordingly, the trial court concluded that Metro did not violate the TPRA by denying Petitioners' requests based on Rule 16.

Regarding school security, the trial court found that The School Security Act of 1981 does not apply to Covenant School because the Act's plain language states that it applies only to public schools.[6] That law is therefore not a bar to disclosure of any otherwise public records. The trial court also found, however, that the TPRA's school security exception, then found at Tennessee Code Annotated section 10-7-504(p), bars disclosure of any "information, records, and plans that are related to school security, produced by any person, entity or source." The trial court concluded that the shooter's writings and compilations, created as she studied and devised her plan to attack the School, are related to school security and are therefore exempt from disclosure.

Next, the trial court determined that the Covenant Intervenors have standing to assert a copyright argument on behalf of the Covenant Children's Trust, notwithstanding the fact that the trust nor its trustee has ever intervened as a party. Further, the trial court concluded that federal copyright law creates a TPRA exception and "thus preempts state open records law." The U.S. Copyright Act grants a copyright owner the exclusive right to, among other things, distribute the covered work or display it publicly. In this case, the TPRA's disclosure requirement would give Petitioners the right to inspect and compile copies of the shooter's original work. This would result in Metro violating the copyright holders' exclusive rights under federal law by distributing or displaying the covered work to the requestors. Consequently, the trial court concluded that the Copyright Act is in direct conflict with the TPRA and that the Copyright Act controls.

Finally, the trial court concluded that the Tennessee Constitution and the Victims' Bill of Rights do not apply to the Covenant Parents because, based on the plain language of both, those rights attach to "crime victims while navigating investigation and prosecution and their dealings" in the criminal justice system. No dealings with the criminal justice system are pending or contemplated here.

The trial court also noted in its final order that the records in this case are voluminous, explaining as follows:

> [Metro] provided the Court with the following hard drives for its *in camera* review: 1.) Scan disk 64 GB (57.2 GB of 64 GB); 2) Black hard drive (6.39 GB of 8 GB); 3) Data Stick Pro containing 2 PDFs (7.20 GB); 4) One Expansion Drive (1.81 TB); 4) Data Stick Pro (7.20 GB); 5) Data Stick Pro (14.3 GB of 14.4); 6) Data Stick Pro (14.3 GB of 14.4 GB); 7) Data Stick Pro (57.7GB); 8) Data Stick Pro (3.71 GB of 3.74 GB) and 9) Data Stick Pro

---

[6] This finding is not at issue on appeal.

(3.69 GB of 3.74 GB). The hard drives contained the following broad categories of content and documents[:]

| | |
|---|---|
| Original Videos | Clip Art |
| Business Folders with Content | Receipts, Mail |
| 911 Phone Communications | Medical Records |
| Email Communications | Screenshots of Video Content |
| MNPD Incident Reports | Search Warrants |
| MNPD History Reports | Complied[7] Information |
| Original Writings | Original Photographs |
| News Content | Maps |
| Yearbook | Downloaded Content |
| Internal MNPD Documents | |

While this Court understands that each criminal investigation and prosecution is unique, the materials provided to the Court, while voluminous, are the type of materials that one would expect to gather when investigating and purs[u]ing a school shooting of this magnitude. Much of the material analyzed by the Court came from the [shooter], compiled over many years. [Metro] also provided redacted versions of certain content for the Court's *in camera* review. None of the materials produced to the Court were produced to any other party to this case.

The above information in the trial court's order is the only information in the technical record indicating what is contained in Metro's files. None of the materials produced to the trial court for its in camera review have been included in the technical record submitted to this Court on appeal.

Mr. Leahy, Star News, Senator Gardenhire, Mr. Hammond, and the TFA (hereinafter, "Petitioners" or, "Appellants") timely appealed to this Court.[8]

### ISSUES

Petitioners, Covenant Intervenors, and Metro all raise issues on appeal. We consolidate and restate those issues as follows:

---

[7] This appears to be a typo; as best we can discern, this category is meant to be "Compiled Information."

[8] On August 8, 2025, Petitioners Leahy and Star News filed a motion asking this Court to consider post-judgment facts. They asked us to take notice of Metro's now public investigative summary and the fact that Metro's investigation is now closed. In an order entered August 22, 2025, we deferred that motion to the panel. The motion is granted.

I.     Whether Metro's investigative file is a public record.

II.    Whether the trial court erred by allowing Metro to raise possible TPRA exemptions aside from Tennessee Rule of Criminal Procedure 16.

III.   Whether the trial court erred in concluding that Tennessee Rule of Criminal Procedure 16 exempts Metro from disclosing any records to Petitioners.

IV.    Whether the trial court erred in concluding that Metro is exempt from releasing the shooter's personal writings pursuant to the school safety exception to the TPRA found at Tennessee Code Annotated section 10-7-504(p).

V.     Whether the trial court erred in concluding that the U.S. Copyright Act preempts the TPRA and bars disclosure of any of the shooter's personal writings.

VI.    Whether the trial court erred in concluding that the Tennessee Constitution and the Victims' Bill of Rights are inapplicable to the Parents in this case.

**DISCUSSION**

*I.     The TPRA generally*

This case stems from public records requests made to Metro regarding its investigation into the March 27, 2023 Covenant School shooting. Accordingly, a brief overview of the TPRA is helpful.

"For more than a century, Tennessee courts have recognized the public's right to inspect governmental records." *Tennessean v. Metro Gov't of Nashville*, 485 S.W.3d 857, 864 (Tenn. 2016). The TPRA governs access to government records and is intended to "provid[e] a tool to hold government officials and agencies accountable to the citizens of Tennessee through oversight in government activities." *Id.* "Through its provisions, the [TPRA] serves a crucial role in promoting accountability in government through public oversight of governmental activities." *Memphis Publ'g Co. v. Cherokee Child. & Fam. Servs., Inc.*, 87 S.W.3d 67, 74 (Tenn. 2002). In light of that purpose, the TPRA is construed "liberally to enforce the public interest in open access to the records of state, county, and municipal governmental entities." *Id.*; *see also Schneider v. City of Jackson*, 226 S.W.3d 332, 340 (Tenn. 2007) ("[T]he General Assembly has directed the courts to construe broadly the Public Records Act 'so as to give the fullest possible access to public records.'" (quoting Tenn. Code Ann. § 10-7-505(d))).

Public records are "all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental entity[.]" Tenn. Code Ann. § 10-7-503(a)(1)(A)(i). The TPRA also provides that

> [a]ll state, county and municipal records shall, at all times during business hours, which for public hospitals shall be during the business hours of their administrative offices, be open for personal inspection by any citizen of this state, and those in charge of the records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

Tenn. Code Ann. § 10-7-503(a)(2)(A). While the foregoing provision is meant "[t]o facilitate access to the records," *Tennessean*, 485 S.W.3d at 864, it is also true that "numerous statutory exceptions" to disclosure exist. *Id.* at 865. Indeed, access to public records "is not absolute . . ." *Id.* Accordingly, even if material constitutes a public record under the TPRA, it may be exempt from disclosure. *See* Tenn. Code Ann. § 10-7-504 (providing categories of exempt public records); *see also Tennessean*, 485 S.W.3d at 865 (explaining that "over the years, the General Assembly has added over forty categories of records specifically excepted from the Act[,]" and that "[t]he once all-encompassing Public Records Act is now more narrow" (footnote omitted)). In addition to the specific exemptions, there is "a general exception to the Public Records Act, based on state law." *Tennessean*, 485 S.W.3d at 865. "Tennessee Code Annotated section 10-7-503(a)(2)(A) provides that governmental records shall be open for inspection and that the right of inspection shall not be denied 'unless otherwise provided by state law.'" *Id.* "'State law' includes statutes, the Tennessee Constitution, the common law, rules of court, and administrative rules and regulations." *Id.* at 865–66 (collecting cases).

The TPRA directs government entities on how to respond to records requests:

(B) The custodian of a public record or the custodian's designee shall promptly make available for inspection any public record not specifically exempt from disclosure. In the event it is not practicable for the record to be promptly available for inspection, the custodian shall, within seven (7) business days:

> (i) Make the public record requested available to the requestor;

> (ii) Deny the request in writing or by completing a records request response form developed by the office of open records counsel. The response shall include the basis for the denial; or

(iii) Furnish the request[o]r in writing, or by completing a records request response form developed by the office of open records counsel, the time reasonably necessary to produce the record or information.

(3) Failure to respond to the request as described in subdivision (a)(2) shall constitute a denial and the person making the request shall have the right to bring an action as provided in § 10-7-505.

Tenn. Code Ann. § 10-7-503(a)(2)-(3).  Pursuant to the procedure outlined above, public records custodians are directed to promptly provide for inspection of any public record not exempt from disclosure.  *Id.* § 10-7-503(a)(2)(B).

In the present case, the disputed records are in Metro's possession because Metro gathered the records during its investigation into the March 2023 Covenant School shooting.  The material was "made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental entity[.]"  Tenn. Code Ann. § 10-7-503(a)(1)(A)(i).  Moreover, a police department's closed investigative files are public records under the TPRA and thus presumed "subject to public inspection." *Griffin v. City of Knoxville*, 821 S.W.2d 921, 923 (Tenn. 1991) (citing *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513 (Tenn. 1986)).  Metro's file is, therefore, a public record under the TPRA.  The dispute in this case is whether the trial court correctly concluded that the records are exempt from disclosure.[9]  As this is a dispute of law, we review the trial court's decision de novo with no presumption of correctness.  *Tennessean*, 485 S.W.3d at 862–63.

The trial court found that Metro's complete investigative file is exempt from disclosure for several reasons.  We address those reasons in turn.  As a threshold issue, however, we must address which of the purported exemptions are properly before this Court.  Mr. Hammond and the TFA[10] argue that the trial court erred in considering *any* TPRA exemptions aside from Tennessee Rule of Criminal Procedure 16.  They argue that because Rule 16 is the only purported exemption Metro offered upon initially denying the records requests, Metro and the Covenant Intervenors are limited to that exemption.  According to Hammond and the TFA, "Metro never amended its original denials prior to the filing of the petitions[,] [and] Intervenors have no textual basis under the TPRA to raise any exception but continued to raise new exceptions nearly a year after these proceedings began."

---

[9] The Parents assert in their appellate brief that Metro's investigative file is not a public record. This issue is without merit.

[10] Senator Gardenhire filed a short appellate brief adopting and incorporating the arguments raised by Petitioners Hammond, the TFA, Leahy, and Star News.  To the extent that arguments raised by those petitioners are addressed, any arguments raised by Senator Gardenhire are therefore also addressed.

Hammond and the TFA rely on *Friedmann v. Marshall County, Tennessee*, 471 S.W.3d 427 (Tenn. Ct. App. 2015), in arguing that the trial court erred in considering new TPRA exemptions raised after Petitioners sought access to the records in court. *Friedmann*, however, is distinguishable from the case at bar. In that case, petitioner Mr. Friedmann sought various records related to the Marshall County jails pursuant to the TPRA. *Id.* at 429. He sent his first request via letter, and a jail administrator informed him that he would have to make his requests in person. *Id.* This exchange sparked a dispute between Mr. Friedmann and county officials, including the sheriff for Marshall County, as to whether the TPRA requires that records requests be made in person. *Id.* at 429–431. Eventually, Mr. Friedmann filed a petition for access to the records in the Chancery Court for Marshall County. *Id.* at 431. The chancery court held a hearing at which the county argued "that Mr. Friedmann was denied access to the requested records due to Mr. Friedmann's failure to prove that he was a resident of Tennessee." *Id.* The hearing on the petition for access was the first time the county raised its argument regarding Mr. Friedmann's residency. *Id.* The chancery court ultimately ruled that the records should be disclosed but denied Mr. Friedmann any attorney's fees after finding that the county did not act willfully in denying access to the records. *Id.* at 432.

Mr. Friedmann appealed to this Court, arguing that the county willfully refused to turn over the records and that he should be awarded his attorney's fees. *Id.* This Court agreed, noting that "[a]lthough [the county] argue[s] on appeal that Mr. Friedmann was denied access to records due to residency concerns, these concerns were not communicated to Mr. Friedmann until the morning of trial." *Id.* at 440. We further explained that

> [a]s the history of correspondence among the parties reveals, Mr. Friedmann's request to obtain records was generally met with the same refrain: to get the records, he would need to make a personal appearance. With respect to his renewed March 24 request, he was simply re-directed once again to [the county's attorney]. At no point did the Sheriff's Office's responses indicate a willingness to process Mr. Friedmann's records request absent a personal appearance. Given the state of the law and the communication of that law to both the Sheriff's Office and the County Attorney, Appellees' failure to comply with Mr. Friedmann's records request was willful.

*Id.* (footnote omitted). Accordingly, the primary issue on appeal in *Friedmann* was whether, in the context of attorney's fees, the county willfully denied Mr. Friedmann access to the records. In analyzing that issue, this Court noted that the county raised a new purported exemption the morning of the final hearing. Mr. Friedmann did not know about this alleged exception until the final hour before trial.

This is a far cry from the procedure used by the trial court in this case. Here, the trial court directed Metro to file a notice reflecting all purported TPRA exceptions on May

- 13 -

24, 2023. There is nothing in the TPRA or *Friedmann* prohibiting such action. Moreover, Petitioners had ample time to respond to all purported TPRA exemptions in this case, including those raised by the Covenant Intervenors. The final show cause hearing did not occur until nearly a year after Metro filed its notice of exemptions and several months after Covenant Intervenors filed their briefs in opposition. The trial court then held a two-day hearing at which all Petitioners had the opportunity to address the alleged TPRA exemptions. Unlike Mr. Friedmann, Petitioners encountered no surprises at the final hearing.

Accordingly, this issue is without merit. We turn to the exceptions found applicable by the trial court.

## II. Tennessee Rule of Criminal Procedure 16

The trial court's first basis for denying Petitioners' requests is Tennessee Rule of Criminal Procedure 16, which addresses inspection and discovery of evidence in criminal prosecutions. In pertinent part, the Rule provides:

> (2) *Information Not Subject to Disclosure.* Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.

In the TPRA context, our Supreme Court has explained that Rule 16 exempts disclosure of law enforcement's investigative files which "are open and are relevant to pending or contemplated criminal action." *Appman v. Worthington*, 746 S.W.2d 165, 166 (Tenn. 1987). The High Court reiterated the *Appman* holding in 2016, explaining that "if the media could make a public records request and obtain the investigative files, then [a] defendant and potential jurors could learn about the State's case against the defendant by reading a newspaper or watching a television news broadcast." *Tennessean*, 485 S.W.3d at 871. Accordingly, requestors relying on the TPRA cannot gain access to "materials subject to discovery between the State and a defendant during the pendency of the criminal case or any collateral challenges to the criminal conviction[.]" *Id.* at 873.

In the present case, the parties spent significant time in the trial court disputing whether Metro's investigation into the shooting remained ongoing or related to a pending criminal matter. Because Metro officers killed the shooter on March 27, 2023, Petitioners argued that no criminal investigation or prosecution was underway. Petitioners maintained that Metro's position was disingenuous and obstructionist. Throughout the trial court proceedings, however, Metro filed sworn statements by its officers providing that Metro

- 14 -

continued investigating whether the shooter acted alone, how the shooter obtained her weapons, and whether the shooter had any co-conspirators. Relying on those sworn statements, the trial court concluded that Rule 16 exempts Metro's file from disclosure.

On appeal, Petitioners argue that this issue is moot and, alternatively, that the trial court erred in applying Rule 16. We address mootness first.

Tennessee courts have long recognized, "since the earliest days of statehood, . . . self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202 (Tenn. 2009). Because "the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions[,]" our role is limited to deciding "legal controversies." *Id.* at 203 (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879); *White v. Kelton*, 232 S.W. 668, 670 (1921)). A "legal controversy" exists when "the disputed issue is real and existing," rather than "theoretical or abstract[.]" *Id.* (internal citations omitted).

As such, we adhere to several justiciability doctrines in determining whether a case presents a legal controversy. *Id.* "These doctrines include: (1) the prohibition against advisory opinions, (2) standing, (3) ripeness, (4) mootness, (5) the political question doctrine, and (6) exhaustion of administrative remedies." *Id.* (footnotes omitted). The justiciability doctrine implicated here is mootness. As our Supreme Court has explained:

> While the doctrines of standing and ripeness focus on the suit's birth, the doctrine of mootness focuses attention on the suit's death. 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper *Federal Practice and Procedure* § 3533.1, at 735–37. A moot case is one that has lost its justiciability either by court decision, acts of the parties, or some other reason occurring after commencement of the case.

*Id.* at 203–04 (citations omitted). "[A] 'case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition.'" *Hooker v. Haslam*, 437 S.W.3d 409, 417 (Tenn. 2014) (quoting *Norma Faye Pyles*, 301 S.W.3d at 203–04). "A case, or an issue in a case, becomes moot when the parties no longer have a continuing, real, live, and substantial interest in the outcome." *Id.* "Determining whether a case is moot is a question of law." *Alliance for Native Am. Indian Rights in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 338–39 (Tenn. Ct. App. 2005).

Because it is now undisputed that Metro's investigation into the Covenant School shooting is closed, Rule 16's applicability is moot. By the time this opinion is released, it will have been nearly three years since the Covenant School shooting. Metro concedes in its brief that its investigation into the shooting is closed and that there is no pending or contemplated criminal prosecution related to the shooting. There is no indication that the

- 15 -

shooter acted in concert with anyone. The Parents likewise concede in their appellate brief that Rule 16 is no longer an applicable bar to any TPRA requests. As such, there is no longer a real and existing dispute as to this issue, and we need not consider it.[11]

The primary dispute in this case is whether the shooter's personal writings and compilations must be disclosed to Petitioners under the TPRA. Indeed, much of the proceedings in the lower court centered around the potential consequences of disclosing those items. Nonetheless, it is clear from the trial court's order that a portion of Metro's investigative file includes material created or collected by Metro, or other government agencies, during Metro's investigation into the shooting. For example, the trial court lists Metro internal documents, search warrants, Metro history reports, Metro incident reports, and 911 phone communications in its final order. As best we can discern from what we know about Metro's file, such items are different from and unrelated to the shooter's personal writings. To the extent that any such material is responsive to Petitioners' records request and was withheld pursuant to Rule 16, those records must be made immediately available for inspection by Petitioners.[12]

### III.     *The school security exception*

The next disputed exception is referred to by the parties as the "school safety" or "school security" exception. The relevant version of the TPRA[13] provides:

> (p) Information, records, and plans that are related to school security, the district-wide school safety plans or the building-level school safety plans shall not be open to public inspection. Nothing in this part shall be interpreted to prevent school administrators of an LEA from discussing or distributing information to parents or legal guardians of children attending the school regarding procedures for contacting or obtaining a child following a natural disaster.

---

[11] No party in this case argues that, notwithstanding mootness, we should still address Rule 16. *See Scripps Media, Inc. v. Tenn. Dep't of Mental Health & Substance Abuse Servs.*, 614 S.W.3d 700, 705 (Tenn. Ct. App. 2019) (TPRA dispute moot where state released records by the time appeal was heard; however, this Court determined that the matter was one of great public importance). Nor do we see any reason to do so.

[12] Petitioners concede that certain information may need to be redacted, such as personally identifying information. *See* Tenn. Code Ann. § 10-7-504(a)(29). They also concede that they do not seek photographs of minors or deceased victims.

[13] There was some dispute in the trial court as to which version of section 10-7-504 applies, as the General Assembly amended the statute following the shooting. The trial court ultimately applied the version of the statute in effect when the petitions for access were filed. No party challenges this ruling on appeal.

Tenn. Code Ann. § 10-7-504(p) (effective July 1, 2022 through April 24, 2023). The extent to which this exception applies is a matter of statutory interpretation. "[W]hen an issue on appeal requires statutory interpretation, we review the trial court's decision de novo with no presumption of correctness." *Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 30 (Tenn. Ct. App. 2018) (citing *Wade v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 469 S.W.3d 54, 58 (Tenn. Ct. App. 2015)). The polestar of statutory interpretation is the intent and purpose of the legislature in enacting the statute. *Id.* We begin by "reading the words of the statutes using their plain and ordinary meaning in the context in which the words appear." *Id.* When the language is clear and unambiguous, we look no further than the language of the statute itself to determine its meaning. *Id.*

The Covenant Intervenors rely on section 10-7-504(p) to argue that the shooter's writings and compiled materials should be kept completely confidential and never open to the public. They argue that disseminating those materials will inspire future mass shooters. Petitioners, on the other hand, contend that this is an overly broad application of the statute. The trial court agreed with the Covenant Intervenors, determining that the statute's language is broad enough to bar disclosure of any "materials and content created and/or compiled by [the shooter] as she studied and devised her plan, not only against this school but others[.]" In pertinent part, the trial court's order provides:

> [T]his Court finds that the Legislature gave a broad exception, which would cover any information, records and plans which are related to three separate categories: 1) school security; 2) the district-wide school safety plan or 3) the building-level school safety plan. Unlike the School Security Act of 1981, "school" is not defined in the TPRA, nor is the term "security." Merriam Webster's Dictionary defines the word "school" as an organization that provides instruction, such as an institution for the teaching of children. (Merriam-Webster 2024). Security is defined as the quality or state of being secure. *Id.* In this section of the exceptions, the General Assembly did not include any qualification or limitation for the type of school security information, records and plans which are subject to this exception. Instead, the exception is left with a broad construction to encompass all information related to the security of any school. The Court of Appeals has further instructed that the term "related to" and other similar phrases also carry a broad meaning as well. *Cordell v. Cleveland Tennessee Hosp., LLC*, 544 S.W.3d 331, 338 (Tenn. Ct. App. 2017). That meaning should not be twisted beyond its ordinary and common understanding. *Id.* Something is "related to" something if it is "connected." *Black's Law Dictionary* 1288 (6th ed. 1990). Indeed, to "relate to" something is "to bring into association with or connection with." *Black's Law Dictionary* 1288 (6th ed. 1990). The Legislature intentionally omitted defining the sources or providers of information, records, and plans concerning school security. This deliberate choice was made to encompass a broad range of information and plans

- 17 -

pertaining to school security that may be in the possession of or come into the possession of the government. Further, the General Assembly's use of the word "or" in this exception, which is used to separate the blanket and nondescript information, records and plans from the other sources of school security plans listed in the exception, is further indicative of the intent to cast a broad net on things which are related to school security. This approach is logical as it is not always feasible to pinpoint the origin and/or perpetrator of information, plans or actions which may be related to school security. In our society, such information and plans often emerge in hindsight, after an incident has occurred. Moreover, if such information happens to be intercepted before an incident, it would be counterproductive to subsequently make it publicly accessible to anyone.

Therefore, this Court finds that *Tennessee Code Annotated* § 10-7-504(p) creates a valid and applicable exemption from disclosure for any information, records, and plans that are related to school security, produced by any person, entity or source. This Court would be hard pressed to find that the original and complied [*sic*] writings, photos, video content, information, original and assumed plans and artwork of an individual whose intent and plan was to cause and inflict harm on the innocent in a school setting would not be related to school security and thus exempt from disclosure.

Having determined that *Tennessee Code Annotated* § 10-7-504(p) creates a valid exemption from disclosure, this Court must analyze if this exemption should apply to all documents and information in the possession of Metro or only certain documents and information. Respondent Metro asserts that redacted versions of certain information and materials can be released without implicating school security, while the other documents at issue do not fall under this particular exception and at the close of the investigation and any contemplated criminal proceedings may be released *in toto*. The Intervenors, on the other hand, argue that all of the material and information held by Respondent in this matter relate to school security and should be exempt from disclosure completely, as the release of any information will inspire copycat attacks and thus all of the information is related in some form to school security.

In presenting their arguments regarding the applicability of *Tennessee Code Annotated* § 10-7-504(p), Petitioner Brewer and Intervenor Parents both rely upon competing experts which have diametrically opposed views on the long- and short-term contagion effects of the writings, material and content of persons who commit crimes such as the ones at issue in this case. Petitioner Brewer relies upon the expert report of Dr. Katherine Kuhlman,

filed with this Court on June 20, 2023 and her supplemental report, filed on March 18, 2024. Dr. Kuhlman is a licensed psychologist who is Board Certified in police and public safety psychology. Dr. Kuhlman supports the release of all requested information. She opined that the release and study of [the shooter's] writings could assist in the understanding of a shooter's pathway to violence and in the prevention and mitigation of targeted violence. She also stated that "the research concerning whether the release of information about a shooter, including his or her writings, will create a contagion that could cause a 'copycat' killer is mixed and uncertain" and that any such possible contagion is highest in the short term, about fourteen (14) days after a shooting incident. She opined that releasing information will be helpful for school security by way of prevention.

The Intervenor Parents rely upon a report from Dr. Erika Felix. The Parents filed an unverified expert report of Dr. Felix on June 20, 2023 and on April 24, 2024 filed it again with the proper verification. Dr. Felix is a licensed psychologist and a professor at the University of California Santa Barbara. She opined that the release of [the shooter's] writings would cause psychological harm to the survivors of the shooting and to the broader community and that such release would also create a risk of inspiring copycat attacks. Dr. Felix thus concluded that the release of information would have the opposite effect of that suggested by Dr. Kuhlman.

\* \* \*

This Court has [ ] reviewed and analyzed firsthand the materials, compilations, information, journals, writings, plans, photos and videos both authored by and complied [*sic*] by the [shooter]. Some information, which the Court finds most concerning, in relation to school security, is the detailing of specific plans and specified places and persons that [the shooter] intended to succumb to injury upon plan implementation. Of grave concern to this Court is that the [shooter] in this incident relied on similar past events across the United States as a blueprint to accomplish and carry out the events on March 27, 2023. [The shooter] studied the plans, writings and video content, inclusive of news coverage footage, of past assailants and idolized how prior terror events were conducted and implemented and the outcomes for both the victims and assailants. [The shooter] used the writings of other perpetrators in similar crimes to guide how this plan was constructed and accomplished, mimicking some not only in their methodology, but also choice of weapons and targets. [The shooter] even held past perpetrators out as heroes in their attacks, idolizing them.

Given the expert reports and the actual documentation analyzed, this Court finds that the contagion and risk of copycat behavior to be real, present and credible long after any fourteen (14) day period. The information analyzed by this Court shows an assailant who depended on, researched and imitated the plans set forth by others in their school shootings, years after their massacres occurred. Considering both expert opinions, this Court finds the Intervenor Parents' expert more persuasive, especially in consideration of the materials analyzed by the Court, regarding the effect on school security that the potential release of the [shooter's] materials and the incentivization of copycat actors.

Finally, in finding that the plain language of *Tennessee Code Annotated* § 10-7-504(p) excepted from disclosure any information related to school security, this Court finds that there are no limitations in the exception regarding the type of information, who created the information, where it came from, nor for whom it was intended. While the Court is aware of the policy favoring disclosure, there is a valid exception for records that relate to school security. . . . *Tennessee Code Annotated* § 10-7-504(p) created an exception from disclosure for anything related to school security. Consequently, this Court concludes that materials and content created and/or compiled by [the shooter] as she studied and devised her plan, not only against this school but others, is information related to school security. This Court finds the possibility that these materials could be used by a copycat shooter, as was the case with [the shooter], to be a real security concern for schools here in Tennessee and across this nation. Therefore, pursuant to *Tennessee Code Annotated* § 10-7-504(p)[], such documents are exempt from disclosure.

(Footnotes and record citations omitted).

On appeal, the Covenant Intervenors defend the trial court's ruling while Petitioners call it "impossibly broad." Petitioners also assert that the statute does not apply to the Covenant School at all, as Covenant School is a private entity not subject to the TPRA.

First, we are unconvinced by the notion that section 10-7-504(p) is inapplicable because Covenant School is private. Petitioners assert that "[t]his exception plainly contemplates records created by or for public schools. The Covenant School is not a government entity. It does not have a 'public records request coordinator,' nor does it have a 'Records Custodian.'" Covenant School, as a private entity, is not itself subject to a direct TPRA request. In this situation, however, we are concerned with records pertaining to a private entity that Metro "received pursuant to law or ordinance or in connection with the transaction of official business[.]" Tenn. Code Ann. § 10-7-503(a)(1)(A)(i). The material's origin is not dispositive; rather, it is public record by virtue of being collected

by Metro during its official government business. Nothing in section 10-7-504(p) suggests that we must consider the material's origin if the material came into the government's possession in the course of government business. *Id.*

Nonetheless, we agree with Petitioners that the trial court's construction is an overly broad, policy-based application of section 10-7-504(p).[14] Our concern over the ruling is two-fold. First, we do not have the benefit of reviewing the material at issue because it does not appear, even sealed, in the appellate record. Nor is there any manner of privilege log shedding light on the contents. The only information this Court is privy to is the "broad categories of content" listed in the trial court's final order, noted above. The trial court further states in its final order that the material is voluminous and spans many years. To that point, the lengthy investigative report released by Metro explains that the shooter's writings precede the Covenant School shooting by many years and that the shooter began journaling years prior as a therapeutic exercise.

Against this backdrop, we are asked to accept at face value the trial court's finding that *every single item* compiled or created by the shooter, for many years before the event at issue, relates to the Covenant School's security. This conclusion strains credulity, and we are neither willing nor able to make the blind logical leap the Covenant Intervenors ask of us. Without a more robust record reflecting which TPRA exceptions apply specifically to which responsive documents and why, our review of this issue is severely hindered. We are particularly troubled by the request made of us considering the TPRA's "noble and worthwhile purpose[,]" which is to "provid[e] a tool to hold government officials and agencies accountable to the citizens of Tennessee through oversight in government activities." *Tennessean*, 485 S.W.3d at 864; *see also Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681, 684 (Tenn. 1994) (directing courts to be "vigilant in upholding th[e] clear legislative mandate" to construe the TPRA broadly, "even in the face of serious countervailing considerations").

Second, affirming the trial court would require us to adjudicate a policy debate we are ill-equipped to address as an intermediate appellate court. The trial court concluded that dissemination of the shooter's original works creates a substantial likelihood of copycat school shootings and that preventing access to such material furthers the greater good of Tennessee schools and schools nationwide. By so concluding, the trial court rejected Petitioners' argument that academic study of a criminal's manifesto lends itself to prevention. Petitioners relied on the affidavit of Dr. Katherine Kuhlman, who opines that academic study of mass shooters' writings is an important aspect of early intervention for potential school shooters.

The trial court adopted the Covenant Intervenors' policy position, which is that "the hateful words of the shooter in this particular case certainly *may* have an audience in the

---

[14] Our research revealed no Tennessee cases construing the school safety exception to the TPRA.

general public. And as a result, you do have individuals who *could* take the writings of the shooter and commit violence against the Covenant School or some other school."[15] (Emphasis added). Respectfully, this argument is rooted in speculation about potential future events, not facts present in the record before us. This is a policy debate not contemplated by, or anywhere mentioned in, the TPRA. The trial court's interpretation of section 10-7-504(p) is, in essence, a policy exception to the TPRA barring any disclosure of a school shooter's writings and compilations. While the language of section 10-7-504(p) is broad, it is not the blanket policy exception created by the trial court. This interpretation ignores the legislative directive "to broadly construe the [TPRA] 'so as to give the fullest possible access to public records[,]'" *Tennessean*, 485 S.W.3d at 864 (quoting Tenn. Code Ann. § 10-7-505(d)), and instead gives the *exemption* the broadest possible construction to limit public access to the documents.

To the extent a school-shooter manifesto exception to the TPRA is warranted, that decision is more appropriately left to the General Assembly or our Supreme Court. *See Schneider*, 226 S.W.3d at 340 (explaining that public policy exceptions to the TPRA are the province of the legislature). Thus, the trial court erred in concluding that section 10-7-504(p) bars disclosure of all the shooter's writings and compilations.

Petitioners concede that they do not seek any information created by Covenant Church or Covenant School regarding its internal safety measures or plans. In addition, such information may be contained within the writings made by the shooter. Any such information should be redacted from responsive documents. *See id.* at 346 (providing that a non-exempt public record "should not be deemed exempt simply because it contains some exempt information. Rather, redaction of the exempt information is appropriate.") (citing *Eldridge v. Putnam Cnty.*, 86 S.W.3d 572, 574 (Tenn. Ct. App. 2001)).[16]

IV.     Copyright

        *Standing*

Next, the trial court concluded that the United States Copyright Act (hereinafter, the "Act") conflicts with the TPRA and preempts same. Before we address the substance of the trial court's ruling, however, Petitioners make a justiciability argument as to the Covenant Parents' ability to raise the copyright argument. To reiterate, the shooter's

---

[15] This quote is taken from the Covenant Intervenors' oral argument at the show cause hearing.

[16] Again, we note that this Court does not have access to the disputed documents, nor do we have access to the trial court's log of the information contained in Metro's file. We are thus forced to rely on the information in the trial court's final order and Metro's report summarizing the shooter's writings. In the event that future appellate review is required in this case, including the trial court's index of documents in the record, under seal if necessary, would greatly aid in this Court's review of any purported TPRA exceptions.

parents assigned the intellectual property rights to the shooter's original works to the Covenant Parents, to be held in trust for the benefit of their children. The assignment document provides that the shooter's parents "[i]rrevocably assign and transfer all of their equitable, legal, and other rights in the Writings and Intellectual Property Rights (including all tangible copies thereof) as a gift to the Parents in trust, for the benefit of the Children[.]" The assignment document also provides that the trust created by the gift is called the Covenant Children's Trust. Inasmuch as the shooter's writings are purportedly original works, the Parents argue that the Act bars Metro from allowing Petitioners to access the writings.

According to Petitioners, however, the Covenant Parents cannot raise this argument because they ignore the legal formalities surrounding trusts. Petitioners point out in their briefing that neither the trustee, in his official capacity, nor the trust itself is a party to this litigation. Petitioners claim that

> [t]he trial court ignored this obvious flaw . . . courts cannot just gloss over the distinction between a party in his individual capacity and a party in his official capacity as trustee. "[I]n most jurisdictions, a trust ... cannot sue or be sued in its own name, and therefore, the trustee, rather than the trust, is the real party in interest in litigation involving trust property." *Khan v. Regions Bank*, 572 S.W.3d 189 (Tenn. App. 2018); *see also* Tenn. Code Ann. § 35-15-811. Because no trustee and no trust claiming ownership of the alleged copyrighted materials intervened in these proceedings, no Intervenor has standing to assert claims on behalf of the trust.

(Record citations omitted).

The Covenant Parents disagree, arguing in their brief that

> [t]he intellectual property ownership of the writings was transferred to the Parents, who are defined in the transfer documents as the same class of people certified by Chancellor Myles to represent the interests of the children. The Parents themselves own the writings and can therefore assert the rights they have in their property. The writings are held in trust for the express benefit of the Parents because they were given for the express purpose of protecting the children by using copyright and other vehicles to prevent release of the writings and the attendant harm that would befall the children. It is not necessary for the trust to intervene to assert the Parents' property interests in their property.

Thus, according to the Parents, they have sufficient standing to raise the copyright argument because their children are the trust beneficiaries.

- 23 -

Petitioners' argument implicates non-constitutional standing, as it deals with who may take legal action on behalf of a trust, which is governed by statute. *See Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 282 (Tenn. 2024) ("Non-constitutional standing is grounded either in self-imposed rules of judicial restraint, such as whether a party asserts its own legal rights and interests rather than those of third parties, or in statutory interpretation, such as whether a party's complaint falls within the zone of interests protected by the statutory provisions at issue."); *see also Denson ex rel. Denson v. Methodist Med. Ctr. of Oak Ridge*, No. E2023-00027-SC-R11-CV, 2025 WL 2902229, at *2 (Tenn. Oct. 13, 2025) (same)). It also implicates the Tennessee Uniform Trust Code, found at Tennessee Code Annotated section 35-15-101 *et seq*. (the "Trust Code"). "Consistent with the evolution in trust law . . . the [Trust Code] confers broad powers on trustees." *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 257–58 (Tenn. 2017). The Trust Code provides, as relevant:

> (a) A trustee, without authorization by the court, may exercise:
>
> (1) Powers conferred by the terms of the trust; and
>
> (2) Except as limited by the terms of the trust:
>
> > (A) All powers over the trust property which an unmarried competent owner has over individually owned property;
> >
> > (B) Any other powers appropriate to achieve the proper investment, management, and distribution of the trust property; and
> >
> > (C) Any other powers conferred by this chapter.

Tenn. Code Ann. § 35-15-815. Moreover, "[a] trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust." Tenn. Code Ann. § 35-15-811.

Accordingly, the trustee of the Covenant Children's Trust, if made a party in his or her capacity as trustee, would most likely[17] have standing to raise the copyright argument. Petitioners claim, however, that the trustee's right to raise this argument is *exclusive* to that of the rights of the trust beneficiaries. Stated differently, Petitioners suggest that trust beneficiaries[18] lack standing to bring a claim on behalf of a trust where the trustee is not

---

[17] Imperatively, aside from the assignment documents executed by the shooter's parents, the record does not contain any documents pertaining to the Covenant Children's Trust. There is no way to discern the full rights conferred to or limitations placed on the trustee without the trust instruments. *See Harvey ex rel. Gladden*, 532 S.W.3d at 259 ("[T]he broad powers given by statute to trustees may be either expanded or limited by the provisions of the governing trust instrument.").

[18] Or, in this case, the parents of beneficiaries where the beneficiaries are minors.

also a party in his or her official capacity. No legal authority cited by Petitioners supports this contention, however, and our review of the Trust Code did not reveal any such authority. Rather, the Trust Code generally provides broad powers to the trustee subject to the terms of the trust instrument. *Harvey ex rel. Gladden*, 532 S.W.3d at 258–59.

The case Petitioners rely on, *Khan v. Regions Banks*, 572 S.W.3d 189 (Tenn. Ct. App. 2018), also does not support their position. In that case, a woman became embroiled in a dispute with a lender which had extended a line of credit to a trust. 572 S.W.3d at 191–92. The woman, who was the trustee, later sued the lender under the Tennessee Consumer Protection Act, both in her individual capacity and in her capacity as trustee. *Id.* at 191. The case proceeded to arbitration at which the lender was awarded its attorney's fees; later, the trustee challenged the trial court's order confirming the arbitration award. *Id.* at 192. The trustee argued that the trial court lacked jurisdiction over the trust because the trust itself was never specifically named as a party in any of the pleadings. *Id.* at 195. Instead, the named party was the trustee, Ms. Khan, "as trustee of the Rafia N. Khan Irrevocable Trust." *Id.* This Court rejected that argument, explaining that "[w]e accept as a matter of fact that none of the previous pleadings identify 'the Rafia N. Khan Irrevocable Trust' as a party. That fact, however, is insufficient as a matter of law to prove that the trial court lacked personal jurisdiction over the trust." *Id.* We explained that "[i]n most jurisdictions, a trust ... cannot sue or be sued in its own name, and therefore, the trustee, rather than the trust, is the real party in interest in litigation involving trust property." *Id.* (quoting 76 Am. Jur. 2d Trusts § 601 (West 2018)). As such, we determined that because Ms. Khan, in her official capacity as trustee, was a party to the arbitration, the trust was bound by the arbitration award.

Contrary to Petitioners' argument, *Khan* does not go so far as to state that without the trustee, the trust beneficiaries or their representative wholly lack standing in any litigation involving trust property. Further, the Trust Code specifically anticipates that one or more beneficiaries of a trust may bring a claim of the trust in place of the trustee. *See* Tenn. Code Ann. § 35-15-811(b) ("A trustee may abandon or assign any claim that it believes is unreasonable to enforce to one or more of the beneficiaries of the trust holding the claim.").[19] Accordingly, this issue is without merit, and we affirm the conclusion that the Covenant Parents have standing to raise the copyright argument.

### *The Act and the TPRA*

Turning to the intersection of the Act and the TPRA, the trial court summarized the parties' respective positions in its final order:

> The Intervenor Parents have asserted that any original works, in any form, created by [the shooter] are exempted from disclosure because they, on

---

[19] Our research revealed no cases citing section 35-15-811.

behalf of their minor children, Jane Doe and John Doe, are the rightful owners of the copyrights to those original works of authorship and original materials held by [Metro] in this case. The Parents assert that although they have not sought copyright registration for any such works, their ownership rights prevent disclosure by [Metro]. They further assert that Metro's release of any of the copyright materials pursuant to the TPRA would violate the federal Copyright Act and their exclusive rights under federal law. In essence, the Parents assert that as the supreme law of the land, federal law preempts the TPRA.

The Petitioners counter . . . that even if the Intervenor Parents did have standing, they failed to register the copyrights with the copyright office. Third, the Petitioners argue that they have the right to fair use of any works protected by copyright as news media outlets and for educational purposes, therefore, federal copyright is not a bar to disclosure under the TPRA. Whether a valid copyright is an exemption to the TPRA is a matter of first impression in Tennessee.

Ultimately, the trial court concluded that the Act preempts the TPRA and that "the original writings, journals, art, photos and videos created by [the shooter] are subject to an exception to the TPRA created by the [Act]." Having reviewed the appellate record and the pertinent authorities, we conclude that the trial court erred, and we reverse the finding that the Act and the TPRA conflict in this case. We reach this conclusion for several reasons.

First, our review is again hindered by the absence of the disputed material in the record. The trial court found that "certain materials responsive to the Petitioners' requests are original works of authorship, compilations and derivative works in various mediums created by [the shooter], including those works created by her in digital form and on various hard drives." Without more information, we cannot reach the same conclusion. Per the Act, "[c]opyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102. "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* "The *sine qua non* of copyright is originality. . . . [o]riginality is a constitutional requirement." *Feist Publn's, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–46 (1991). Parts of an author's work may qualify for copyright protection, while other elements may not. Thus, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Id.* at 348. Rather, "[w]hether reproduction of a particular document would violate the Copyright Act depends upon the characteristics of that document . . . ." *Venetian*

*Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 935 n.4 (D.C. Cir. 2008); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

Both the trial court and Metro acknowledge that the material confiscated from the shooter is voluminous and spans many years. Although the Parents claim that the shooter's writings and compilations are original, copyrightable works, the writings are not registered with the United States Copyright Office,[20] and it is unclear the extent to which the Parents have examined the writings themselves. Nonetheless, the trial court found, and the Parents assert on appeal, that Metro's disclosure of the writings would essentially amount to copyright infringement. An infringement claim, however, requires "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361 (citing *Harper & Row*, 471 U.S. at 548). Inasmuch as the Parents ask us to essentially conclude that disclosure to Petitioners amounts to copyright infringement, it is a curious thing that neither this Court nor the Parents know what the material at issue contains, much less the extent to which it qualifies for copyright protection. Under similar circumstances, the Court of Appeals for the D.C. Circuit concluded that a copyright issue was not ripe for judicial review. *See Venetian*, 530 F.3d at 935 n.4 ("Whether reproduction of a particular document would violate the Copyright Act depends upon the characteristics of that document, but the record indicates neither the precise nature of the documents Venetian has submitted nor of the documents, if any, the Commission intends to disclose.").[21]

---

[20] The Parents correctly point out that copyright protection does not require registration. 17 U.S.C. § 408; *see also Brooks-Ngwenya v. Indianapolis Pub. Schs.*, 564 F.3d 804, 806 (7th Cir. 2009). Registration is, however, "a prerequisite to suing for infringement." *Brooks-Ngwenya*, 564 F.3d at 806 (citing 17 U.S.C. § 411(a)). We only point out the lack of registration to highlight one of the logical problems with the argument that Metro's disclosure of the documents would amount to infringement; specifically, that we are asked to assume one of the elements of an infringement action—a valid copyright.

[21] For the same reason, we are unpersuaded by the trial court's finding that "Tennessee would not be the first state to hold that certain copyrightable works, where the right is asserted, are exempt from disclosure pursuant to state public records laws." In the cases cited by the trial court, the content of the disputed material was clear. *See Caroff v. Rutgers, State Univ. of N.J.*, No. A-3773-20, 2022 WL 3363911, at *1 (N.J. Super. Ct. App. Div. Aug. 16, 2022) (petitioner sought "film of the 12/05/2020 men's college football game between Penn State and Rutgers"); *Attorney IO News, LLC v. Regents of the Univ. of Cal.*, No. 19SMCV01228, 2022 WL 1552234, at *3 (Cal. Super. Apr. 21, 2022) (petitioner sought college course materials from computer science classes, but "Defendant [ ] produced evidence establishing that faculty members, not Defendant, own the copyright to course materials they create"); *Brancheau v. Demings*, No. 2010-CA-6673, 2010 WL 7971871 (Fla. Cir. Ct. Dec. 15, 2010) (seeking video footage of the death of a SeaWorld employee, where the "videos were created by SeaWorld, on SeaWorld's private property . . .").

Second, assuming for purposes of argument that the material exempted by the trial court qualifies for copyright protection, those protections do not necessarily conflict[22] with the TPRA in this case. Under the Act, a copyright owner holds certain exclusive rights, subject to exceptions. These rights include the right:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. Section 106 confers "a bundle of exclusive rights." *Harper & Row*, 471 U.S. at 546. "[T]hese rights—to publish, copy, and distribute the author's work—vest in the author of an original work from the time of its creation." *Id.* at 547. The Act defines certain of these exclusive rights. For example,

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or

---

[22] As the trial court correctly noted, "when a state law is in conflict with a federal law, the state law is 'without effect' and thus displaced by federal law or in other words preempted." (citing *Cadence Bank, N.A. v. The Alpha Tr.*, 473 S.W.3d 756, 765 (Tenn. Ct. App. 2015) (internal citations omitted)). However, "[a] state law is 'conflict' preempted only 'to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). Thus, when it is possible to comply with both state and federal law and the state law does not stand as an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal law, the state law is not preempted.

with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

\* \* \*

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

\* \* \*

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.

Here, the trial court found that "[r]equiring [Metro] to allow public inspection, display or copying of the original materials created by [the shooter] would violate and conflict with the exclusive federal rights granted to copyright owners . . ." The Parents reiterate this point on appeal, arguing in their brief that "by itself making copies, by authorizing a request[o]r to make copies, or by making a copyrighted work available to the public, [Metro] could be liable for direct and/or contributory copyright infringement."

The trial court and the Parents, however, conflate the concept of access for inspection with reproduction and display. Indeed, the TPRA requires that "[a]ll state, county and municipal records shall, at all times during business hours, which for public hospitals shall be during the business hours of their administrative offices, be open for personal inspection by any citizen of this state . . ." Tenn. Code Ann. § 10-7-503(a)(2)(A). We interpret the TPRA broadly to promote access to the records, in keeping with the statutory purpose. Considering this statutory purpose, we can construe the TPRA in such a way that does not require Metro to publicly display its file. Nor need Metro distribute the records to the public; rather, Metro need only allow Petitioners access for personal inspection. Although the Act protects the means by which copyrighted material may be obtained, the Act itself does not inure total confidentiality and secrecy. As another state court confronted with this issue noted, "[o]ne could certainly disclose a record without either reproducing or distributing the same record." *Nat'l Council on Tchr. Quality v. Curators of Univ. of Mo.*, 446 S.W.3d 723, 728 (Mo. Ct. App. 2014); *see also Ali v. Phila. City Plan. Comm'n*, 125 A.3d 92, 102 (Pa. Commw. Ct. 2015) ("[N]ot *every* disclosure of

- 29 -

copyrighted material without the owner's consent violates the Copyright Act."). By the same token, Metro may allow access to the records for personal inspection without itself copying, displaying, or publishing the records. This result "allow[s] the public to scrutinize [Metro's] reliance on or consideration of the copyrighted material[,]"*Ali*, 125 A.3d at 105, thus furthering the purposes of the TPRA.

That said, we acknowledge the potential issue foreseen by the trial court. Assuming for argument that the Parents hold a valid copyright and that Petitioners seek copies of the material pursuant to section 10-7-506, where does this leave Metro as the records custodian? In *Ali*, the Pennsylvania appellate court explained this dilemma well:

> Although the rights conferred on the copyright holder are subject to "fair use," the Copyright Act is nonetheless problematic for local agencies when faced with a RTKL[23] request that seeks copyrighted materials. Unless the copyright holder has consented to duplication, duplication of the copyrighted material under the RTKL carries the risk that the copyright holder will sue the local agency for infringement in federal court. If found to be an infringer, the local agency could be held liable to the copyright holder for actual or statutory damages, which, in the case of willful infringement, could be up to $150,000. 17 U.S.C. § 504. The local agency could also be ordered to pay the copyright owner's costs and attorneys' fees. *Id.* § 505. All the while, the local agency is expending taxpayer dollars in costs and attorneys' fees to defend itself in an infringement action occasioned not by its own assessment of the risk and subsequent voluntary disclosure, but by forced disclosure by [court order].

*Id.* at 102.

This concern, while reasonable, falls outside the scope of what we must decide today. This is a TPRA case in which Metro is the respondent. Thus, our ruling is narrowly tailored to address only Metro's obligations under the TPRA and whether it can meet that obligation without running afoul of the Act. Construing the TPRA broadly to promote access to public records, as we are required, we conclude that under these particular circumstances, the only overt action Metro must take to meet its obligation is to allow Petitioners access to the records for personal inspection. Although we acknowledge the copying rights conferred to the public by section 10-7-506, we do not opine whether it is advisable for Petitioners to copy or otherwise reproduce those records upon said personal inspection and access.

Simply put, so long as Metro maintains the records, it must allow Petitioners access to same for personal inspection. Tenn. Code Ann. § 10-7-503(a)(2)(A). Whether

---

[23] "RTKL" stands for "Right-to-Know Law." *See* 65 P.S. § 67.101, *et seq.*

Petitioners choose to go further than that considering their potential copyright liability is left to them. Likewise, if the Parents wish to pursue a copyright infringement action against Petitioners based on how the Petitioners choose to use the information in the records, the Act provides the Parents with that remedy. *See Venetian*, 530 F.3d at 935 n.4 (citing 17 U.S.C. § 504) ("We note also that, should the EEOC infringe its copyright, Venetian has a remedy in damages."); *see also Nat'l Council on Tchr. Quality v. Minn. State Colls. & Univs.*, 837 N.W.2d 314, 319 (Minn. Ct. App. 2013) ("If [Minnesota law] requires a Minnesota governmental entity, such as MnSCU, to release copies of public data, the person or entity receiving the data takes the information subject to the owner's [federal copyright] rights. All of the author's rights and remedies under the [Act] are unimpeded.").

The Parents argue that the weight of authority on this issue supports their position. Respectfully, our research suggests otherwise. The cases addressing the issue before us reflect a variety of results. For example, several courts have held that while the Act applies to public records, the fair use limitation, found at 17 U.S.C. section 107, allows the records to be copied. *See, e.g.*, *Zellner v. Cedarburg Sch. Dist.*, 731 N.W.2d 240, 247 (Wisc. 2007) ("Applying the 'fair use' factors outlined in 17 U.S.C. § 107 in this case, we are satisfied that the CD and the memo do not fall within the copyright exception under Wis. Stat. § 19.32(2)."); *Nat'l Council on Tchr. Quality*, 837 N.W.2d at 318 (fair use allowed disclosure under Minnesota law where requestor, a non-profit working for educational reform, planned to use the information for "criticism, comment, . . . scholarship, or research"); *ACLU of Utah Found., Inc. v. Davis Cnty.*, No. 180700511, 2021 WL 1215891, at *6 (Utah Dist. Ct. Mar. 25, 2021) (concluding "that the laws of copyright do not limit the release of the Utah Jail Standards to these Petitioners for the uses they have outlined[,]" where "the type of use envisioned by these Petitioners falls easily within the fair use doctrine of federal copyright law"); *State ex rel. Rea v. Ohio Dep't of Educ.*, 692 N.E.2d 596, 601–02 (Ohio 1998) ("Exceptions to public records requests do not include the copyright defense where the public records fall under the 'fair-use' exception to the federal copyright statute or where the copyrighted material is purchased by the public office or agency that is the subject of the public records request.").[24]

On the other hand, at least one court has rejected the fair use argument, finding that to be the sole purview of the federal courts. *Curators of Univ. of Mo.*, 446 S.W.3d at 729 ("[T]his court lacks the authority to determine whether a particular use of copyrighted materials constitutes fair use, as federal courts have 'original jurisdiction of any civil action arising under the [Act].'"); *see also Pictometry Int'l Corp. v. Freedom of Info. Comm'n*, 59 A.3d 172, 192 (Conn. 2013) (noting that the court lacks "jurisdiction to determine whether a particular use of copyrighted materials infringes on the copyright holder's rights under federal copyright law or, instead, constitutes a fair use of the materials").

---

[24] Petitioners argue on appeal that the fair use exception allows Metro to release the disputed records. In light of our decision that the TPRA and Act do not conflict here, we need not delve into Petitioners' intended uses for the information.

Accordingly, there is no weight of authority as the Parents suggest. Rather, the results vary and depend in part upon the language of the state law at issue. And here, the TPRA's text provides a solution that allows Metro to comply with Petitioners' requests while avoiding conflict with the Act.

To summarize, the trial court erred in concluding that the Act preempts the TPRA and presents an exemption for the disputed records in this case. Metro can satisfy its obligations under the TPRA by allowing Petitioners to access the records for personal inspection, thereby avoiding conflict with the Act. *Ali*, 125 A.3d at 102 ("The [Act] does not restrict inspection."); *Curators of Univ. of Mo.*, 446 S.W.3d at 728 n.6 (same). To the extent Petitioners then engage in actionable conduct under the Act, the Parents may pursue the remedy available to them, as those remedies remain unimpeded, and Petitioners can raise any relevant defenses.

### *The Tennessee Constitution and the Victims' Bill of Rights*

The final issue raised on appeal is whether the trial court erred in concluding that rights conferred on crime victims in Tennessee do not bar disclosure of the shooter's writings. Pursuant to our Constitution, "victims of crimes" are entitled to "be free from intimidation, harassment and abuse throughout the criminal justice system." Tenn. Const. Art. I, § 35. Additional rights conferred by this section include:

> the right to confer with the prosecution; the right to be present at all proceedings where the defendant has the right to be present; the right to be heard, when relevant, at all critical stages of the criminal justice process as defined by the General Assembly; the right to be informed of all proceedings, and of the release, transfer, or escape of the accused or convicted person; the right to a speedy trial or disposition and a prompt and final conclusion of the case after the conviction or sentence; the right to restitution from the offender; and the right to be informed of each of the rights established for victims.

*See id.* Likewise, "[a]ll victims of crime and prosecution witnesses have the right to . . . [b]e treated with dignity and compassion . . . ." Tenn. Code Ann. § 40-38-102(a)(1).

The TPRA provides that public records shall be open "for personal inspection by any citizen of this state . . . unless otherwise provided by state law." Tenn. Code Ann. § 10-7-503(a)(2)(A). "State law" in this context means "the Tennessee Constitution, the common law, rules of court, and administrative rules and regulations." *Tennessean*, 485 S.W.3d at 865–66 (citing *Swift v. Campbell*, 159 S.W.3d 565, 571–72 (Tenn. Ct. App. 2004)). Accordingly, the Covenant Parents posit that the "catch-all" TPRA exception applies here, as they are crime victims under the Tennessee Constitution and section 40-38-102. The Parents assert that the writings should be exempt because releasing them

- 32 -

will cause the Parents and the surviving Covenant School students to suffer intimidation, harassment, and abuse.  The trial court ruled against the Parents as to this issue, concluding as pertinent:

> The plain language of *Tennessee Constitution Article* I, § 35 focuses on the criminal legal system, the criminal process, and the treatment of crime victims while navigating investigation and prosecution and their dealings in that system. *Tenn. Const. Art. I*, § 35. While this Court acknowledges that the plain language of *Tennessee Code Annotated* §§ 40-38-102(a)(1) states that crime victims have the right to be treated with dignity and compassion, when the statute is read as a whole, it is limited to the treatment of victims of crime as they make their way through the criminal legal system. While the [Parents] may be correct that once a person has experienced a crime they are always a victim, they can point to no Tennessee law or case, and this Court has found none, which would shield victims of crime or offer them any protections outside of the rights afforded to them while involved in the criminal legal system. Therefore, this Court holds that neither *Tenn. Const. Art. I*, § 35 nor *Tennessee Code Annotated* § 40-38-301, et seq. provides any exception to disclosure under the TPRA for the materials at issue in this particular case.

The trial court's analysis is apt, and we affirm this portion of the ruling.  The text of both Article I, section 35 and section 40-38-102 makes clear that the rights conferred therein apply to crime victims navigating a criminal case at various stages of a pending or contemplated criminal prosecution.  The Covenant Intervenors cite no legal authority, nor did our research reveal any, supporting their contention that Tennessee victims' rights law serves as a shield against TPRA requests[25] to a third party.  On appeal, the Parents assert that

> the [trial court] limited victim protections to "the criminal legal system," but the actual language of the Tennessee Constitution says that victims are free from "intimidation, harassment, and abuse *throughout the criminal **justice** system*." Tenn. Const., Art. I, § 35. Simply stated, the [trial court] applied the wrong language. The rights of victims apply to the entire criminal justice system, not just the legal system. The "criminal justice system" is defined to include police investigations, whether or not they lead to prosecutions.

At this juncture, there is neither a legal proceeding nor a police investigation.  While the Parents are crime victims in the non-legal sense, they are not victims in the specific context

---

[25] Although the argument was raised in a case before our Supreme Court, the majority did not address it as part of the holding because the records at issue were exempted from disclosure for other reasons. *Tennessean*, 485 S.W.3d at 873.

of the laws on which they rely. Moreover, the Parents' argument is speculative. There is simply no way to prove the future injuries the Parents assert they will suffer should the writings be released. This issue is without merit and not a basis for exemption of any documents under the TPRA. We affirm this portion of the trial court's ruling.

Having addressed the issues raised on appeal, the question becomes what to do on remand. First, the trial court shall instruct Metro to release any responsive documents that were withheld solely based on Rule 16. Second, the trial court shall determine which of the shooter's writings and other works are exempt from disclosure under section 10-7-504(p), in accordance with this opinion. **No record in Metro's file should be deemed exempt "simply because it contains some exempt information."** *Schneider*, 226 S.W.3d at 346 (emphasis added). "Rather, redaction of the exempt information is appropriate." *Id.* (citing *Eldridge*, 86 S.W.3d at 574). Further,

> [t]he trial court has discretion to prescribe additional procedures as necessary to govern the proceedings on remand. The entire process should be concluded as expeditiously as possible. Because almost three years has passed since the first request for this information, we encourage the trial court to impose upon [Metro] an expedited schedule for completion of its review of the [requested public records].

*Id.*

## CONCLUSION

The ruling of the Chancery Court for Davidson County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs on appeal are assessed one-half to the appellants and one-half to the appellees, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE